# IN THE SUPREME COURT, STATE OF WYOMING

# 2025 WY 113

### OCTOBER TERM, A.D. 2025

**October 21, 2025**

CHRISTOPHER ROBERT HICKS,

Appellant
(Defendant),

v.                                                          S-24-0323

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
The Honorable Stuart S. Healy III, Judge

*Representing Appellant:*
> Lauren McLane, Pro Hac Vice, Laramie, Wyoming; Devon Petersen, Laramie Wyoming. Argument by Ms. McLane.

*Representing Appellee:*
> Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General. Argument by Ms. Jones.

*Amici Curiae Robert B. Keiter and the State Law Research Initiative:*
> Thomas Carl Garvie, Rogers & Garvie, LLC, Laramie, Wyoming; Kyle C. Barry, State Law Research Initiative, Waltham, MA; and Thomas Roberts, Philips Black, Inc., Philadelphia, PA.

*Before BOOMGAARDEN, C.J., and FOX\*, GRAY, FENN, and JAROSH, JJ.*

*\* Justice Fox retired from judicial office effective May 27, 2025, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (2023), she was reassigned to act on this matter on May 28, 2025.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]    Christopher Robert Hicks was sentenced in 2006 to three consecutive terms of life imprisonment without the possibility of parole for his role in two murders committed when he was nineteen.  In 2024, he filed a motion to correct his sentences, arguing mandatory life without parole sentences for emerging adults are an unconstitutional form of cruel or unusual punishment.  He also argued his sentences violated the equal protection provisions in the Wyoming Constitution by impermissibly targeting youthful offenders.  The district court denied the motion and Mr. Hicks appealed.  We affirm.

## ISSUES

[¶2]    Mr. Hicks presents numerous issues for review concerning the constitutionality of his mandatory life without parole sentences.  The State presents two threshold issues regarding the justiciability of Mr. Hicks' claims.  We organize and restate the issues as follows:

I.      Is this Court precluded from reaching the merits of Mr. Hicks' appeal?

    A.      Are Mr. Hicks' claims barred by res judicata?

    B.      Does the Court lack jurisdiction because Mr. Hicks did not follow the notice requirements of Wyoming's Uniform Declaratory Judgments Act?

II.     Does the Wyoming Constitution afford emerging adults broader constitutional rights than the Eighth Amendment to the United States Constitution?

III.    Do Mr. Hicks' mandatory life without parole sentences violate Article 1, Section 15 of the Wyoming Constitution?

IV.     Are Mr. Hicks' mandatory life without parole sentences cruel or unusual under Article 1, Section 14 of the Wyoming Constitution?

V.      Are Mr. Hicks' mandatory life without parole sentences cruel and unusual punishment under the Eighth Amendment to the United States Constitution?

VI.     Do Mr. Hicks' mandatory life without parole sentences violate the equal protection provisions of the Wyoming Constitution?

VII.    Is Mr. Hicks entitled to a new sentencing hearing?

1

# FACTS

[¶3]     Mr. Hicks was born and raised mostly in Arizona.  In ninth grade, his parents moved the family to Gillette, Wyoming, where Mr. Hicks had difficulties adapting and became estranged from his parents.  He dropped out of school but sought to reorient his life by joining the military.  While in basic training, Mr. Hicks received a medical discharge for an injury.  He returned to Gillette, began drinking and using drugs, and moved into a home with forty-year-old Kent Proffit, Sr., and three other men aged eighteen and nineteen — Kent Proffit, Jr., Jacob Martinez, and Jeremy Forquer.

[¶4]     This Court previously summarized in his direct appeal, and in greater detail, the circumstances leading up to Mr. Hicks' crimes.  *See Hicks v. State*, 2008 WY 83, ¶¶ 3-11, 187 P.3d 877, 879 (Wyo. 2008).  In brief, those events began in 2005 when Mr. Hicks was nineteen years old.  *Id.*, ¶ 3, 187 P.3d at 879.  Mr. Hicks was planning to bring a large quantity of marijuana to Gillette and solicited Mr. Martinez to help sell it, but the plan supposedly went bad.  *Id.,* ¶ 4.  Mr. Proffit, Sr., offered to help because he was "connected," and led both Mr. Hicks and Mr. Martinez to believe he had resolved their problems.  *Id.* To repay him, Mr. Proffit, Sr., then told the two younger men they owed him favors.  *Id.*

[¶5]     At that time, Mr. Proffit, Sr., was awaiting trial on charges that he sexually assaulted his sixteen-year-old stepson BC.  *Id.*, ¶ 5.  He told Mr. Hicks and Mr. Martinez that one of the favors they owed him was to kill BC.  *Id.*  Mr. Proffit, Sr., also told both men that their roommate, Mr. Forquer, was "working for the cops" and could tell law enforcement of their discussions about killing BC and their involvement with drugs.  *Id.*, ¶ 6.  Accordingly, a plan was developed to kill Mr. Forquer — Mr. Proffit, Sr., would ask Mr. Hicks to perform a chokehold and the men would get Mr. Forquer to volunteer for the demonstration.  *Id.*  Instead of demonstrating the chokehold and then letting go, Mr. Hicks would continue strangling Mr. Forquer until he died.  *Id.*

[¶6]     The men implemented their plan late one evening in the kitchen of their home.  *Id.*, ¶ 7.  Mr. Proffit, Sr., Mr. Hicks, Mr. Martinez, and a frequent visitor to the home, fifteen-year-old Michael Seiser, were present.  *Id.*  As Mr. Proffit, Sr., requested, Mr. Hicks demonstrated the chokehold on Mr. Forquer and maintained it until his victim lost consciousness.  *Id.*  Mr. Hicks, however, indicated he was getting tired.  *Id.*  Concerned Mr. Forquer might still be alive, Mr. Proffit, Sr., directed Mr. Martinez to get a rope and tighten it around his neck until the men were certain he was dead.  *Id.*  After Mr. Martinez did so, the men cleaned up the kitchen, placed Mr. Forquer's body and personal items in the trunk of Mr. Hicks' car, and deposited the body and belongings at various points along the interstate west of Gillette.  *Id.*, ¶ 8, 187 P.3d at 880.

[¶7]     After Mr. Forquer was murdered, Mr. Proffit, Sr., revisited his interest in killing BC.  *Id.,* ¶ 9.  He told Mr. Hicks, Mr. Martinez, and Mr. Seiser he would have them killed if they did not kill BC.  *Id.*  Together, they decided to shoot BC.  *Id.*  The murder would

2

take place over Thanksgiving while Kent Proffit, Sr., was in Sheridan, giving him an alibi. *Id.*

[¶8] In the early morning hours on the day after Thanksgiving, Mr. Hicks, Mr. Martinez, and Mr. Seiser drove to BC's home. *Id.*, ¶ 10. Mr. Hicks helped Mr. Martinez open the door to the home and returned to the car. *Id.* Mr. Martinez then went inside and shot BC. *Id.* Afterward, they hid the empty bullet casings in a garbage can of another man they hoped would be identified as a suspect in the murder, disposed of the gun in a septic tank, and returned home. *Id.* BC's mother later discovered his body. *Id.*

### Trial, Sentencing, and Direct Appeal

[¶9] The State charged Mr. Hicks with two counts of first-degree murder as an accessory under Wyo. Stat. Ann. § 6-2-101(b) (2004) and two counts of conspiracy to commit first-degree murder under Wyo. Stat. Ann. §§ 6-2-101(b) (2004) and 6-1-303(a) (2004). The State sought the death penalty for Mr. Hicks due to his alleged involvement in the murder of fifteen-year-old BC. *See* Wyo. Stat. Ann. § 6-2-102(e), (h)(ix) (2004) (aggravating circumstance related to victims less than age seventeen).

[¶10] In August 2006, following a trial, the jury acquitted Mr. Hicks of first-degree murder of Mr. Forquer. However, the jury convicted Mr. Hicks of (1) conspiracy to commit murder in the first-degree of Mr. Forquer; (2) murder in the first-degree of BC; and (3) conspiracy to commit murder in the first-degree of BC. Mr. Hicks was nineteen at the time of his offenses and convictions.

[¶11] Mr. Hicks received two sentencing hearings. Following a two-day sentencing phase, the jury declined to sentence Mr. Hicks to death, and instead, sentenced him to two terms of life in prison without parole for the crimes against BC. The district court held a second hearing several weeks later related to Mr. Forquer's murder, which included additional sentencing testimony and evidence. The district court sentenced Mr. Hicks to life in prison without parole for conspiracy to murder Mr. Forquer. Mr. Hicks was to serve the three sentences consecutively. Mr. Hicks' life without parole sentences are considered mandatory sentences because the statute imposed legislatively required punishments. *See, e.g.,* Wyo. Stat. Ann. § 6-2-101(b) (2004). Mr. Hicks filed a direct appeal challenging the district court's denial of his motion to suppress post-arrest statements he made to law enforcement and his motion for a new trial. *Hicks*, ¶ 2, 187 P.3d at 879. This Court affirmed the district court's rulings. *Id.,* ¶ 38, 187 P.3d at 885.

### Mr. Hicks' Motion to Correct Illegal Sentences

[¶12] On July 24, 2024, Mr. Hicks filed a motion to correct illegal sentences pursuant to Wyoming Rule of Criminal Procedure 35(a) (W.R.Cr.P.). He argued new federal precedent and science developed since his initial sentencing made his mandatory life without parole

3

sentences unconstitutional because emerging adults[1] share the same youthful characteristics with juveniles, for whom mandatory life without the possibility of parole sentences are impermissible.

[¶13] Mr. Hicks largely directed his constitutional challenges at Article 1, Sections 14, 15, and 16 of the Wyoming Constitution. He argued these State constitutional provisions collectively provide broader sentencing protections than the Eighth Amendment of the United States Constitution. On these grounds, he also challenged the constitutionality of the sentencing statutes used to render his three consecutive life without parole sentences. *See* Wyo. Stat. Ann. §§ 6-2-101(b) (2004), 6-1-201(b)(iii) (2024), and 6-10-301 (2024).[2]

[¶14] Mr. Hicks relied on the *Roper/Graham/Miller* trilogy of United States Supreme Court cases to support his argument that the district court should extend "*Miller*-protections" to emerging adults in Wyoming. His reference to "*Miller*-protections" comes from *Miller v. Alabama,* 567 U.S. 460 (2012), where the United States Supreme Court held that the Eighth Amendment protection against cruel and unusual punishment prohibits sentencing schemes wherein a sentence of life imprisonment without the possibility of parole is mandatory for juvenile offenders in homicide cases. As this Court later explained, *Miller* instead "requires an individualized sentencing hearing for every juvenile convicted of first-degree murder at which the sentencing court must consider the individual, the factors of youth, and the nature of the homicide in determining whether to order a sentence that includes the possibility of parole." *Bear Cloud v. State*, 2013 WY 18, ¶ 44, 294 P.3d 36, 47 (Wyo. 2013).

[¶15] The Supreme Court made clear in *Miller* that its ruling applied to those under age eighteen at the time of their crimes. *Miller,* 567 U.S. at 465. *Miller* was an extension of *Roper v. Simmons*, which held the Eighth Amendment bars capital punishment for those who were under eighteen when their crime was committed. *Roper v. Simmons*, 543 U.S. 551, 574-75 (2005). Meanwhile in *Graham v. Florida*, 560 U.S. 48 (2010), the Supreme Court held the Eighth Amendment categorically prohibits imposing life without parole sentences for juvenile offenders convicted of non-homicide crimes.

[¶16] Even though Mr. Hicks was nineteen when he committed his crimes, and not a juvenile as in *Roper*, *Graham*, and *Miller*, he maintained in his motion that those cases relied on older science and Wyoming courts should use more recent data to arrive at a

---

[1] Mr. Hicks uses both the term "late adolescents" and the term "emerging adults" in the briefing and record below. It is unclear what age group Mr. Hicks alleges constitutes either term. Although Mr. Hicks' briefing and expert materials largely discuss emerging adults as individuals between ages eighteen and twenty-one, some cited experts suggest those upward of age twenty-five or twenty-nine could also be included in the cohort. For this appeal, we have no need to define the emerging adult age group and will refer to Mr. Hicks' proposed class as "emerging adults."

[2] Wyo. Stat. Ann. § 6-2-101(b) (2004) was the version in effect when Mr. Hicks was sentenced in 2006 while, § 6-1-201(b)(iii) has not been amended since his sentencing.

different conclusion. In particular, he asked the district court to conclude both juveniles and emerging adults are "constitutionally different" from adults.

[¶17] In support of his argument, Mr. Hicks also filed ten exhibits, including expert testimony from four individuals. Those experts include (1) Dr. Karagh Brummond, a neuroscientist at the University of Wyoming who detailed her findings on late adolescent brain development; (2) Dr. Kayla Burd, a University of Wyoming psychologist who explained distinctions in the development of emerging adults and summarized the social trends that support treating the cohort differently; (3) Dr. Max Wachtel, a psychologist who evaluated Mr. Hicks to determine his current level of developmental function; and (4) Andrea Titus, a mitigation specialist who examined the defense team's presentation of Mr. Hicks' 2006 case. The materials also included letters from corrections staff, corrections records, and Mr. Hicks' disciplinary record from the Wyoming Department of Corrections.

[¶18] Mr. Hicks separately claimed in his motion that his sentences violate the Eighth Amendment of the United States Constitution and the equal protection provisions of the Wyoming Constitution. Finally, Mr. Hicks requested a new sentencing hearing to more fully consider his youthful character at the time of his crimes.

[¶19] In response to the motion, the State argued Mr. Hicks' constitutional claims are barred by res judicata, and he did not demonstrate good cause to revisit his sentence. The State also asserted *Miller* does not support his claims because the ruling only addressed the punishment for those under age eighteen. Finally, the State argued Mr. Hicks failed to meet his burden of showing that the Wyoming Constitution affords the type of protections he seeks for emerging adults, and even if he did, W.R.Cr.P. 35(a) cannot afford him categorial relief from the sentencing statutes.

### *The District Court's Order*

[¶20] The district court denied Mr. Hicks' motion in a written order. It reached the merits of the motion notwithstanding the State's argument that res judicata barred Mr. Hicks' constitutional claims, relying in part on our ruling in *Nicodemus*, where we rejected a similar res judicata argument. *See Nicodemus v. State*, 2017 WY 34, ¶ 15, 392 P.3d 408, 412 (Wyo. 2017).

[¶21] In denying the merits of Mr. Hicks' motion, the district court again relied on *Nicodemus*. In that case, an offender pled guilty to two counts of first-degree murder committed when he was eighteen. *Nicodemus*, ¶ 1, 392 P.3d at 410. He received two consecutive life sentences for the murders and an additional eight to ten years for a related larceny. *Id.* Mr. Nicodemus later challenged the constitutionality of those sentences post-*Miller*, arguing he was entitled to *Miller* protections because when he committed his crimes the age of majority in Wyoming was nineteen. *Id.*, ¶ 24, 392 P.3d at 414. This Court concluded Mr. Nicodemus' sentences were not unconstitutional because *Miller* drew a

5

clear line at age eighteen. *Id.*, ¶ 28, 392 P.3d at 415. We also found Mr. Nicodemus did not meet his burden of demonstrating that the sentencing statute in place when he was sentenced violated Article 1, Section 15 of the Wyoming Constitution. *Id.*, ¶ 38, 392 P.3d at 417. In denying Mr. Hicks' Rule 35(a) motion, the district court followed a similar line of reasoning, which Mr. Hicks now challenges on appeal.

## STANDARD OF REVIEW

[¶22] This appeal presents multiple issues involving different standards of review. We summarize those standards below and incorporate them in our discussion.

[¶23] "The court may correct an illegal sentence at any time." W.R.Cr.P. 35(a). "An illegal sentence is one that exceeds statutory limits, imposes multiple terms of imprisonment for the same offense, or otherwise violates constitutions or the law." *Brown v. State,* 2004 WY 119, ¶ 7, 99 P.3d 489, 491 (Wyo. 2004). Whether a sentence is illegal is determined by referencing the applicable statute or constitutional provisions and is subject to statutory or constitutional interpretation. *Id.* (citation omitted). The district court's denial of a motion to correct an illegal sentence under W.R.Cr.P. 35(a) is a question of law that we review de novo. *Patterson v. State*, 2013 WY 153, ¶ 22, 314 P.3d 759, 764 (Wyo. 2013) (citing *Manes v. State*, 2007 WY 6, ¶ 7, 150 P.3d 179, 181 (Wyo. 2007)).[3]

[¶24] Whether a challenge is barred by res judicata is a question of law that we review de novo. *Nicodemus*, ¶ 9, 392 P.3d at 411 (citing *Bird v. State*, 2015 WY 108, ¶ 9, 356 P.3d 264, 267 (Wyo. 2015)). Whether subject matter jurisdiction exists is a question of law we review de novo. *Kurtenbach v. State*, 2012 WY 162, ¶ 10, 290 P.3d 1101, 1104 (Wyo. 2012) (citations omitted).

[¶25] Issues of constitutionality present questions of law. *Cathcart v. Meyer*, 2004 WY 49, ¶ 7, 88 P.3d 1050, 1056 (Wyo. 2004) (citing *Reiter v. State*, 2001 WY 116, ¶ 7, 36 P.3d 586, 589 (Wyo. 2001)). In determining the constitutionality of a statute, we have previously stated:

> The party challenging the constitutionality of a statute bears the burden of proving the statute is unconstitutional. That burden is a heavy one in that the appellant must clearly and exactly show the unconstitutionality beyond any reasonable

---

[3] We review the denial of a W.R.Cr.P. 35(a) motion de novo because "the imposition of an illegal sentence is not within the discretion of a sentencing court." *Palmer v. State*, 2016 WY 46, ¶ 9, 371 P.3d 156, 158 (Wyo. 2016) (citations omitted). Our de novo standard of review for denying a motion to correct an illegal sentence should not be confused with the abuse of discretion standard of review applied when a district court denies a motion to reduce a sentence under W.R.Cr.P. 35(b). *See Hurtado v. State*, 2023 WY 63, ¶ 7, 531 P.3d 306, 308 (Wyo. 2023) (quoting *Leners v. State*, 2022 WY 127, ¶ 24, 518 P.3d 686, 695 (Wyo. 2022)) (reviewing the denial of a motion for sentence reduction as an abuse of discretion).

6

doubt. In our analysis, we presume the statute to be constitutional. Any doubt in the matter must be resolved in favor of the statute's constitutionality. Although we have the duty to give great deference to legislative pronouncements and to uphold constitutionality when possible, it is the court's equally imperative duty to declare a legislative enactment invalid if it transgresses the state constitution.

*Gordon v. State*, 2018 WY 32, ¶ 12, 413 P.3d 1093, 1099 (Wyo. 2018) (citation modified).

## DISCUSSION

### *Res Judicata and the Uniform Declaratory Judgments Act*

[¶26] The State advances two threshold arguments that could prevent this Court from considering the merits of Mr. Hicks' appeal. First, the State argues res judicata precludes the Court from reviewing the constitutionality of Mr. Hicks' sentences. Second, the State argues the Court lacks subject matter jurisdiction to consider the constitutionality of the sentencing statutes at issue.

### I.     The State has not demonstrated res judicata applies.

[¶27] The State maintains that Mr. Hicks' constitutional arguments were known to him at the time of his trial and direct appeal, and therefore, are subject to res judicata. The State also argues the ends of justice do not compel the Court to consider the merits of Mr. Hicks' appeal. The district court proceeded with the merits of Mr. Hicks' arguments, notwithstanding the State's res judicata argument.

[¶28] We review whether res judicata bars a motion to correct an illegal sentence de novo. *Majhanovich v. State*, 2021 WY 135, ¶ 7, 499 P.3d 995, 997 (Wyo. 2021) (citing *Russell v. State*, 2021 WY 9, ¶ 9, 478 P.3d 1202, 1204 (Wyo. 2021)).

[¶29] A court may correct an illegal sentence at any time under Rule 35, but motions to correct an illegal sentence are not immune from res judicata. *See* W.R.Cr.P. 35(a); *see also Russell*, ¶ 11, 478 P.3d at 1205. Res judicata precludes relitigation of an issue when four factors are met: "(1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; and (4) the capacities of the persons are identical in reference to both the subject matter and the issues between them." *Majhanovich*, ¶ 8, 499 P.3d at 997 (citing *Russell*, ¶ 12, 478 P.3d at 1205). A party can avoid application of res judicata if he demonstrates good cause for not raising an issue in an earlier proceeding. *Id.,* ¶ 9 (citing *Goetzel v. State*, 2019 WY 27, ¶ 13, 435 P.3d 865, 869 (Wyo. 2019)).

7

[¶30]   The State does not discuss how the four res judicata factors listed above apply in this appeal.  While the caption and case history leave little question that the first two factors are met, this Court does not fill in the blanks for the parties.  *See Woods v. State*, 2017 WY 111, ¶ 18, 401 P.3d 962, 969 (Wyo. 2017) (noting longstanding precedent that this Court "will not frame the issues for the litigants and will not consider issues not raised by them and not supported by cogent argument and authoritative citation.").

[¶31]   Notwithstanding, this case is postured almost identically to *Nicodemus*, where we declined to apply res judicata.  *See Nicodemus*, ¶¶ 13-15, 392 P.3d at 412.  The United States Supreme Court issued the previously discussed *Miller* and *Graham* decisions pertaining to the Eighth Amendment's restrictions after Mr. Hicks was sentenced in 2006.  Although Mr. Hicks was not a juvenile at the time of his crimes, he presents developed claims that call on the Court to consider extending *Miller* and *Graham*, and to independently explore unexamined issues under the Wyoming Constitution.  As a result, we will exercise our discretion to consider his arguments.  *See id.*, ¶ 15 (Court exercising discretion to consider similar challenge).

## II.   The Uniform Declaratory Judgments Act notice requirements do not apply to a motion to correct an illegal sentence.

[¶32]   The State also argues Mr. Hicks did not comply with the notice requirements for challenging the constitutionality of a statute.  The State claims this Court lacks subject matter jurisdiction because Mr. Hicks did not serve the Attorney General in accordance with Wyoming Statute § 1-37-113.

[¶33]   Whether subject matter jurisdiction exists is a question of law we review de novo.  *Kurtenbach*, ¶ 10, 290 P.3d at 1104.  This appeal, and the basis for the requested relief, arises from a motion to correct an illegal sentence.  *See* W.R.Cr.P. 35(a); *see also Hamilton v. State*, 2015 WY 39, ¶ 14, 344 P.3d 275, 281 (Wyo. 2015) (holding that the trial court retains jurisdiction in criminal proceedings to consider Rule 35 motions).

[¶34]   We are puzzled by the State's argument that Mr. Hicks is subject to the notice requirement in § 1-37-113 because at no point does Mr. Hicks claim to seek relief under the Uniform Declaratory Judgments Act.  The Uniform Declaratory Judgments Act is remedial and is afforded a liberal construction, but the State does not offer any support for its assertion that the Act applies to a motion to correct an illegal sentence.  *See* Wyo. Stat. Ann. § 1-37-114 (2024) (stating the Act "is to be liberally construed and administered").  Moreover, the State provides no example, and we have found none, where this Court has applied the notice requirement in the Uniform Declaratory Judgments Act to a motion to correct an illegal sentence.

[¶35] Regardless, the State was a party to the proceedings before the district court and is a party on appeal. As a result, its position on the constitutional questions at issue are well known, and its interests have been adequately represented.

[¶36] The State has failed to demonstrate that the notice requirement in § 1-37-113 applies to a motion to correct an illegal sentence. Post-conviction relief proceedings are a continuation of the underlying criminal proceedings. *Hamilton*, ¶ 14, 344 P.3d at 281. This Court has subject matter jurisdiction to consider Mr. Hicks' appeal.

### *Constitutional Issues*

[¶37] Mr. Hicks argues that, taken together, Article 1, Sections 14, 15, and 16 of the Wyoming Constitution provide broader protections to emerging adults than the Eighth Amendment to the United States Constitution. He also asserts that the life without parole sentences issued against him violate both the Wyoming Constitution and the Eighth Amendment, as well as the equal protection provisions of the Wyoming Constitution. Finally, he claims he is entitled to a new sentencing hearing to consider his youthfulness as a mitigating factor.

[¶38] Our discussion below is largely organized in the order of those arguments. We first examine whether the Wyoming Constitution affords sentencing protections to emerging adults as a distinct category of criminal offender. That discussion includes an analysis of Article 1, Sections 14, 15, and 16 of the Wyoming Constitution, concluding that, while distinct from the United States Constitution, they do not support Mr. Hicks' contention that emerging adults are entitled to categorical protection. We then examine whether Mr. Hicks' sentences nonetheless violate Article 1, Sections 14 and 15 of the Wyoming Constitution, concluding they do not. Following that, we discuss the Eighth Amendment to the United States Constitution and then the equal protection provisions of the Wyoming Constitution, again concluding Mr. Hicks' sentences are not unconstitutional. Finally, we conclude Mr. Hicks is not entitled to a new sentencing hearing.

### I.   The Wyoming Constitution does not afford sentencing protections to emerging adults as a distinct category of criminal offender.

[¶39] Mr. Hicks argues, when construed together, Article 1, Sections 14, 15, and 16 of the Wyoming Constitution support extending *Miller* protections to emerging adults. He also argues these same provisions afford broader protections for emerging adults than the Eighth Amendment.

[¶40] In support of his constitutional challenge, Mr. Hicks offers textual, historical, and analytical arguments. His presentation of the issues constitutes the "precise, analytically sound approach" that this Court requires litigants to advance when pursing a claim arising from the Wyoming Constitution. *Dworkin v. L.F.P., Inc.*, 839 P.2d 903, 909 (Wyo. 1992);

*see also Bear Cloud v. State*, 2014 WY 113, ¶ 14, 334 P.3d 132, 137 (Wyo. 2014) (*Bear Cloud III*) ("Recourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned.") (citations omitted).

[¶41] When interpreting the Wyoming Constitution, our purpose is "to give effect to the intent of the people in adopting it." *Rasmussen v. Baker*, 50 P. 819, 821 (Wyo. 1897); *see also Cathcart*, ¶ 39, 88 P.3d at 1065 (same). To determine that intent, we look first to the plain and unambiguous language used in the text of the constitution. *Saunders v. Hornecker*, 2015 WY 34, ¶ 19, 344 P.3d 771, 777 (Wyo. 2015) (citing *Rassmussen,* 50 P. at 821)).[4] The parties do not contend the Wyoming Constitution is ambiguous with respect to the issues presented. *See Cathcart*, ¶ 39, 88 P.3d at 1065 (stating if the language is unambiguous, there is no need for construction, and the Court presumes the framers intended what was plainly expressed).

A. **Article 1, Sections 14, 15, and 16 do not support Mr. Hicks' assertion that the Wyoming Constitution adopted the humanitarian theory of punishment.**

[¶42] Mr. Hicks' constitutional challenge rests in the text of Article 1, Sections 14, 15, and 16. He argues these provisions collectively adopt the humanitarian theory of punishment and render mandatory life without parole sentences for emerging adults unconstitutional.

[¶43] In construing the Wyoming Constitution, we follow the same rules we apply to statutory interpretation. *In re Neely*, 2017 WY 25, ¶ 41, 390 P.3d 728, 742 (Wyo. 2017) (citing *Cathcart*, ¶ 39, 88 P.3d at 1065). This Court is guided by the full text, paying attention to its internal structure and the functional relation between the parts and the whole. *Leal v. State ex rel. Dep't of Workforce Servs.*, 2024 WY 86, ¶ 14, 553 P.3d 1181, 1186 (Wyo. 2024) (quoting *Seherr-Thoss v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2014 WY 82, ¶ 19, 329 P.3d 936, 945 (Wyo. 2014)). Each word is to be afforded meaning, with none rendered superfluous. *Id.*; *see also Geringer v. Bebout*, 10 P.3d 514, 520-21 (Wyo. 2000) (recognizing the constitution should be read *in pari materia*). This Court also "applies the words according to their ordinary and obvious meaning." *Skoric v. Park Cnty. Cir. Ct., Fifth Jud. Dist.*, 2023 WY 59A, ¶ 9, 532 P.3d 667, 670 (Wyo. 2023) (citation omitted); *see also Rassmussen*, 50 P. at 823 (stating this Court respects "the ordinary and obvious meaning of the words employed").

---

[4] Our precedent also states "we must apply the constitution's language in the context of the times in which we live." *Mogard v. City of Laramie*, 2001 WY 88, ¶ 17 n.4, 32 P.3d 313, 318 n.4 (Wyo. 2001); *see also Chicago & N.W. Ry. Co. v. Hall*, 26 P.2d 1071, 1073 (Wyo. 1933) ("The Constitution is, in a sense, a living thing, designed to meet the needs of progressive society, amid all the detail changes to which such society is subject.") (citation omitted). These precedents are not necessary to address the issues raised in this case.

[¶44]  We will examine each section before considering Mr. Hicks' collective argument.

### 1.  Article 1, Section 14

[¶45]  Article 1, Section 14 provides "[a]ll persons shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great.  Excessive bail shall not be required, nor excessive fines imposed, nor shall cruel or unusual punishment be inflicted."  Wyo. Const., art. 1, § 14.  The text "nor shall cruel or unusual punishment be inflicted" is pertinent to Mr. Hicks' appeal.

[¶46]  Section 14 uses the disjunctive "cruel or unusual" as opposed to the interdependent "cruel and unusual" in the Eighth Amendment.  This Court has discussed that distinction before and concluded under the Wyoming provision a claimant "is only required to show that the sentence was either cruel or unusual before [he or she] is entitled to relief." *Norgaard v. State*, 2014 WY 157, ¶ 23, 339 P.3d 267, 274 (Wyo. 2014); *see also Johnson v. State*, 2003 WY 9, ¶ 35, 61 P.3d 1234, 1249 (Wyo. 2003); and *Sampsell v. State*, 2001 WY 12, ¶¶ 10-11, 17 P.3d 724, 727-28 (Wyo. 2001).

[¶47]  This Court's prior interpretations of Article 1, Section 14 suggest that ratification did not fix the definitions of "cruel" or "unusual," as we will discuss in more detail later in this opinion.  Our earliest interpretations of the terms "cruel" and "unusual" reflect both a retrospective and prospective purpose.  For example, this Court understood that Section 14 was aimed at preventing "the imposition of obsolete, painful, and degrading punishments" from a bygone era.  *In re McDonald*, 33 P. at 21.  On the other hand, the Court also understood Section 14 prohibits novel, and not yet adopted, punishments that "shock the moral sense of the people." *Id.*

[¶48]  As a result, "cruel" and "unusual" as used in Article 1, Section 14 are defined to prohibit both obsolete punishments and excessive forms of punishment not yet enacted.  Historically, courts have clearly stated painful and degrading punishments, or punishments that inflict torture or lingering death, are prohibitively "cruel." *Id.*;  *In re Kemmler*, 136 U.S. 436, 447 (1890).   But this Court has also defined cruelty in the context of proportionality.  *See Fisher v. McDaniel*, 64 P. 1056, 1061 (Wyo. 1901); *see also Martinson v. State*, 2023 WY 88, ¶ 29, 534 P.3d 913, 921 (Wyo. 2023) (stating Section 14 prohibits "punishment that is grossly disproportionate to the gravity of the crime").  Similarly, the term "unusual" includes archaic modes of punishment.  *In re McDonald*, 33 P. at 21.  But "unusual" also requires the Court to look to other jurisdictions to determine whether the punishment is rare or uncommon.  *See Fisher*, 64 P. at 1061 (comparing contempt punishments in three other states); *see also* Journal and Debates of the Constitutional Convention of the State of Wyoming, Sept. 2-30 (1889) (defining "unusual" as "unheard of, some punishment the law does not contemplate.").

11

## 2. Article 1, Section 15

[¶49] Article 1, Section 15, states "[t]he penal code shall be framed on the humane principles of reformation and prevention." Wyo. Const., art. 1, § 15. In a prior interpretation of Section 15, this Court stated:

> [Article 1, § 15 of the Wyoming Constitution] is not so narrowly drawn that we would be justified in concluding that the only factors which the court may consider in the imposition of sentence are prevention and rehabilitation. The provision speaks to the penal code, not to sentencing, and we are unable to detect any intent on the part of the Constitutional Convention to so limit the discretion of sentencing judges in criminal cases.

*Cohee v. State,* 2005 WY 50, ¶ 20, 110 P.3d 267, 274 (Wyo. 2005) (quoting *Jahnke v. State*, 692 P.2d 911, 930 (Wyo. 1984), *overruled on other grounds by Vaughn v. State*, 962 P.2d 149, 151 (Wyo. 1998)). Unlike Section 14, which applies broadly to "punishments," Section 15 requires a challenge directed at "the penal code."

[¶50] Section 15 does not apply to sentencing decisions rendered by courts because the plain text makes clear it is "the penal code" that shall be framed on the dual mandate of reformation and prevention. *See Penal Code*, Black's Law Dictionary (9th ed. 2009) ("A compilation of criminal laws, [usually] defining and categorizing the offenses and setting forth their respective punishments."); *see also Penal Code*, Webster's Third New International Dictionary (2023) ("[A] code of laws concerning crimes and offenses and their punishment").[5] The Wyoming Constitution vests the Legislature with legislative power, including the authority to enact criminal statutes. *Newport Int'l Univ., Inc. v. State, Dep't of Educ.*, 2008 WY 72, ¶ 22, 186 P.3d 382, 388 (Wyo. 2008) (recognizing "Article 3, § 1 of the Wyoming Constitution vests legislative power in the State's legislature.") (citation omitted); *see also Hicklin v. State*, 535 P.2d 743, 752 (Wyo. 1975) ("The authority over sentencing comes from the legislature."). Thus, Section 15 requires the Legislature to frame criminal laws and associated punishments upon the humane principles of reformation and prevention.

---

[5] The ordinary definition of "penal code" has remained unchanged for a century. *See Penal Code*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (1924); *see also Gordon*, ¶ 31, 413 P.3d at 1103 ("To determine what the drafters intended, we attempt to understand the meaning of the words at the time the constitution was ratified.") (citation omitted).

### 3. Article 1, Section 16

[¶51] Article 1, Section 16 addresses the conduct of jails and provides, "[n]o person arrested and confined in jail shall be treated with unnecessary rigor. The erection of safe and comfortable prisons, and inspection of prisons, and the humane treatment of prisoners shall be provided for." Wyo. Const., art. 1, § 16. We find the plain language of Section 16 contains two operative clauses. *See Johnson v. State Hearing Exam'rs Off.*, 838 P.2d 158, 165 (Wyo. 1992) (stating "the particular protections" of unambiguous constitutional language "must be harmonized with other protective language."). The first clause affirmatively protects persons arrested and confined in jail from unnecessary rigor. The second clause requires the State to meet certain standards associated with correctional facilities and the treatment of prisoners. In tandem, Section 16 unequivocally addresses the conditions associated with our jails and prisons.

[¶52] Mr. Hicks, however, does not challenge the conditions of his confinement. His appeal focuses on the term of his sentences. Mr. Hicks also does not explain why Section 16 is relevant to the lawfulness of his sentences. Instead, he maintains Section 16 constitutes the final leg of a constitutional triad that adopts the humanitarian theory of punishment where "reformation of the prisoner is [the] one animating purpose" of the penal system.

### 4. Considering Sections 14, 15, and 16 Together

[¶53] We decline Mr. Hicks' invitation to read Sections 14, 15, and 16 collectively in this case for two reasons. First, Mr. Hicks provides no legal or textual basis for this Court to find his sentences unconstitutional under Article 1, Section 16. The plain language in Section 16 addresses the conditions of confinement, not the length of a criminal sentence. *See* Wyo. Const., art. 1, § 16. Unlike the Wyoming Constitution's general prohibition on cruel or unusual punishments in Section 14, which can apply to either unlawful forms of punishment or conditions of confinement, Section 16 applies uniquely to the conditions of Wyoming jails and prisons. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 102-06 (1976) (analogously applying the federal Eighth Amendment prohibition on cruel and unusual punishments in case alleging prison officials failed to provide inmate with adequate medical care).

[¶54] Second, we find the argument that the three constitutional provisions adopt a humanitarian theory of punishment unconvincing. Both Mr. Hicks and the amicus curiae rely on *Laramie County* for the proposition that the Wyoming Constitution "expressly adopts the humanitarian theory" of punishment. *State v. Bd. of Comm'rs of Laramie Cnty.*, 55 P. 451, 459 (Wyo. 1898). "*Laramie County* involved a tax dispute between the State and Laramie County[.]" *Nicodemus*, ¶ 36, 392 P.3d at 416-17 (summarizing *Laramie County,* 55 P. at 455-56). Although *Laramie County* sets forth the proposition that "the Penal Code shall be framed upon the humane principles of reformation and prevention," in

*Nicodemus* this Court made clear that this statement cannot be taken out of context and does not carry controlling weight in the criminal justice context. *Nicodemus*, ¶¶ 35-37, 392 P.3d at 416-17 (explaining the underlying issue in *Laramie County* resolved a local government tax dispute, not the constitutionality of a sentence).[6]

[¶55]  When interpreting the constitution, our purpose is to discern its intent from "the instrument itself" and not amorphous theories. *Rasmussen*, 50 P. at 821; *see also Bordewick v. Alaska*, 569 P.2d 184, 188 (Alaska 1977) (finding it inappropriate to "enter into a dialog on the merits of various theories of punishment" when interpreting a similarly situated criminal administration provision in the Alaska Constitution).  The cited discussion in *Laramie County* may informally capture the Court's sentiment at that time, but Article 1, Sections 14, 15, and 16 did not expressly adopt the humanitarian theory of punishment.

### B.  State *Saldana* Analysis for Article 1, Sections 14 and 15

[¶56]  While we conclude that the combination of Article 1, Sections 14, 15, and 16 do not represent the humanitarian theory suggested by Mr. Hicks, that is not the end of the constitutional inquiry.  Rather, we need to consider whether Sections 14 and 15 provide broader protections than the Eighth Amendment by prohibiting mandatory life sentences without parole for emerging adults.

[¶57]  This Court has not yet conducted a comprehensive review to determine precisely whether or how differences between the Wyoming Constitution and the federal Eighth Amendment equate to broader protection. *Norgaard*, ¶ 25, 339 P.3d at 274.  However, we have identified six "non-exclusive neutral criteria" litigants may use to help the Court determine whether the Wyoming Constitution extends broader rights than the United States Constitution.  *Sheesley v. State*, 2019 WY 32, ¶ 15, 437 P.3d 830, 836 (Wyo. 2019) (discussing *Saldana v. State*, 846 P.2d 604, 624 (Wyo. 1993) (Golden, J., concurring)).  These six *Saldana* factors "*are neither compulsory nor exclusive.*" *Id.* (quoting *O'Boyle v. State*, 2005 WY 83, ¶ 24 n.4, 117 P.3d 401, 408 n.4 (Wyo. 2005)) (emphasis in original).  Mr. Hicks uses these factors to argue that the Wyoming Constitution provides broader protections to emerging adults than the Eighth Amendment to the United States Constitution.

[¶58]  The six *Saldana* factors from Justice Golden's concurrence are:  "(1) the textual language; (2) the differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern." *Saldana*, 846 P.2d at 622 (quoting *Washington v. Gunwall*, 720 P.2d 808, 811 (Wash.

---

[6] During argument, Mr. Hicks acknowledged *Laramie County* is only of interest because two members of that Court were constitutional delegates and conceded the reasoning in *Laramie County* — that reformation is the "animating purpose" for the penal code — is too narrow and does not account for other penological justifications this Court has recognized.

1986)). "We emphasize that these are 'non-exclusive' criteria. The identification of these factors does not mean they are the *only* criteria for analyzing a state constitutional claim or that they *all* must be addressed in every case." *O'Boyle*, ¶ 24, 117 P.3d at 408 n.4 (emphasis in original).

### 1. The text, differences in the texts, and structural differences.

[¶59] This Court has recognized that three of the *Saldana* factors — the textual language, differences in the texts, and structural differences — are intertwined. *Mogard v. City of Laramie*, 2001 WY 88, ¶ 8, 32 P.3d 313, 316 (Wyo. 2001). Having already concluded the text of Article 1, Section 16, does not support Mr. Hicks' appeal, we will focus on Sections 14 and 15 and begin with the first, second, and fifth *Saldana* factors.

[¶60] As we previously explained, and as Mr. Hicks points out, Article 1, Section 14 uses the disjunctive "cruel or unusual" as opposed to the interdependent "cruel and unusual" in the Eighth Amendment. This Court has also concluded under Article 1, Section 14, a claimant "is only required to show that the sentence was either cruel or unusual before [he or she] is entitled to relief." *Norgaard*, ¶ 23, 339 P.3d at 274. However, aside from identifying this distinction in Section 14, Mr. Hicks does not explain why the difference is relevant to analyzing criminal sentences for emerging adults.

[¶61] When examining the text of the Wyoming Constitution, we also consider whether the state provision is more explicit or lacks a precise federal counterpart. *See Gunwall*, 720 P.2d at 61. Article 1, Section 15 requires the Legislature to frame the penal code "on the humane principles of reformation and prevention." Wyo. Const., art. 1, § 15. The United States Constitution has no textual analog to Section 15. *See Harmelin v. Michigan*, 501 U.S. 957, 999 (1991) (recognizing "the Eighth Amendment does not mandate adoption of any one penological theory") (Kennedy, J., concurring). Over time, the federal and state criminal systems have accorded different weights at different times to various penological goals. *See id.,* at 999. The Wyoming Constitution, however, expressly states the penal code, at minimum, must serve two penological goals — reformation and prevention. We emphasize *at minimum* because this Court has consistently recognized other valid sentencing justifications. *Nicodemus*, ¶ 34, 392 P.3d at 416 (summarizing cases); *see also Wright v. State*, 670 P.2d 1090, 1093 (Wyo. 1983) (recognizing "(1) rehabilitation, (2) punishment (specific deterrence and retribution), (3) example to others (general deterrence), and (4) removal from society (incapacitation or protection of the public)" are acceptable sentencing objectives consistent with Article 1, Section 15).

[¶62] Mr. Hicks does not offer any direct textual support for the proposition that mandatory life without parole sentences are categorically unconstitutional for emerging adults. And our review of the Wyoming Constitution reveals no such bright line. The Wyoming Constitution establishes different age requirements to serve in the State militia and to vote. *See* Wyo. Const., art. 17, § 1 (age seventeen to serve in the State militia); *see*

*also* art. 6, § 2 (age twenty-one to vote until the ratification of the Twenty-Sixth Amendment to the United States Constitution in 1971).[7]  It also sets various qualifications for elected officials and judicial officers.  *See, e.g.,* Wyo. Const., art. 3, § 2 (age twenty-five to serve in the State Senate and twenty-one to serve in the State House); Wyo. Const., art. 4, §§ 2, 11 (age thirty to serve as Governor and twenty-five for the remaining statewide offices); *and* Wyo. Const., art. 5, §§ 8, 12 (age thirty to serve as a Supreme Court Justice and twenty-eight to serve as a District Court Judge).  None of the age requirements in the Wyoming Constitution — ranging from age seventeen to thirty — expressly or implicitly address criminal culpability.

[¶63]  The Wyoming Constitution also speaks uniquely to Mr. Hicks' life imprisonment without parole sentences.  Article 3, Section 53 states the Legislature "may by law create a penalty of life imprisonment without parole for specified crimes which sentence shall not be subject to commutation by the governor."  Wyo. Const., art. 3, § 53.  Here, the Wyoming Constitution expressly provides the Legislature with the discretion to enact life imprisonment without parole sentences.

[¶64]  Structurally, Mr. Hicks argues the placement of Sections 14 and 15 in the Wyoming Constitution's Declaration of Rights demonstrates a commitment to provide broader protections than the Eighth Amendment.[8]  The Eighth Amendment is comparably situated within the federal Bill of Rights,  so we decline to assign any significance to Mr. Hicks' argument about the placement of Sections 14 and 15 in Article 1 of the Wyoming Constitution.  U.S. Const. amend. VIII; *see also Almada v. State*, 994 P.2d 299, 309-10 (Wyo. 1999) (stating the weight given to any structural differences between the state and federal constitutions "do not assist us one way or another" in our determination).  Nonetheless, we acknowledge the framers structured Sections 14 and 15 into two distinct constitutional provisions.  Because this appeal invokes both provisions, we will review both in light of each other, as well as the related provision in Article 3, Section 53.  *See Cathcart*, ¶ 40, 88 P.3d at 1065 ("Every statement in the constitution must be interpreted in light of the entire document, with all portions thereof read *in pari materia*.").

[¶65]  In addition to drawing comparisons with the text of the federal constitution, this Court can compare the Wyoming Constitution with the text of other state constitutions.

---

[7] Although the text of Article 6, Section 2, still states those "the age of twenty-one years and upwards" are qualified to vote, the Twenty-Sixth Amendment to the United States Constitution established eighteen as the voting age in both federal and state elections.

[8] We also find no merit in Mr. Hicks' structural argument that the Wyoming Constitution prioritizes individual rights more than the United States Constitution merely because Wyoming's Declaration of Rights "boasts" thirty-nine sections compared to the ten amendments constituting the Bill of Rights.  Such scorekeeping overlooks this Court's primary purpose, focusing on the text of the constitution.  *See Vasquez v. State*, 990 P.2d 476, 485 (Wyo. 1999) (noting the Wyoming Constitution contains a longer list of rights but also that it uses "more detailed and more specific language" and "contains language and rights not provided for in the Federal Constitution.").

*See, e.g., Dworkin*, 839 P.2d at 913 (discussing how Wyoming's free speech/libel provision shares similarities with thirty-eight other state constitutions); *see also Gunwall*, 720 P.2d at 812 (indicating the second non-exclusive neutral factor can include the recognition of significant differences in the text of "state constitutions."). Such comparisons are only for textual guidance just as "decisions in other states bearing on the same or similar constitutional language are afforded persuasive effect." *Saunders*, ¶ 23, 344 P.3d at 778 (quoting *Simms v. Oedekoven*, 839 P.2d 381, 384 (Wyo. 1992)).

[¶66] Use of the disjunctive "cruel or unusual" in Section 14 is not uncommon amongst state constitutions.[9] The use of disjunctive language was not unintentional, and we must treat the words "cruel" and "unusual" separately in the context of Section 14. *Johnson*, ¶ 35, 61 P.3d at 1249.

[¶67] Section 15, however, is unique to the Wyoming Constitution. The Montana Constitution, at statehood, had a similar provision declaring: "[l]aws for the punishment of crime shall be founded on the principles of reformation and prevention, but this shall not affect the power of the legislature assembly to provide for punishing offenses by death." Mont. Const. art. III, § 24 (1889). A version of that text was carried over in its 1972 Montana Constitution but was substantially amended in 1998. *Compare* Mont. Const. art. II, § 28 (1972) *with* Mont. Const. art. II, § 28(1) ("Laws for the punishment of crime shall be founded on the principles of prevention, reformation, public safety, and restitution for victims.") (current). The Alaska Constitution included a related mandate at its statehood — reformation and the need for protecting the public — but also substantially amended its provision in 1994. *Compare* Alaska Const., art. 1, § 12 (1959) *with* Alaska Const., art. 1, § 12 (current). Thus, Article 1, Section 15 provides direction for framing criminal statutes that is more explicit than the United States Constitution and unique to the Wyoming Constitution.

[¶68] In summary, the text, differences in text, and structural differences in the Wyoming Constitution support that Article 1, Sections 14 and 15 provide more distinct protections than the Eighth Amendment. However, nothing about those three factors lends support to the proposition that the Wyoming Constitution provides broader protection for emerging adults than the Eighth Amendment.

## 2. Constitutional History

[¶69] Constitutional history is generally not dispositive when the text of a constitutional provision is clear and unambiguous. *See Powers v. State*, 2014 WY 15, ¶ 39, 318 P.3d

---

[9] No fewer than fifteen other state constitutions use a variation of the disjunctive cruel or unusual phrase. *See* Ala. Const., Art. I, § 15; Ark. Const., Art. 2, § 9; Cal. Const., Art. 1, § 17; Haw. Const., Art. 1, § 12; Kan. Const., Bill of Rights § 9; Mass. Const., pt. 1, art. 26; Mich. Const., Art. 1, § 16; Minn. Const., Art. 1, § 5; Miss. Const., Art. 3, § 28; Nev. Const., Art. 1, § 6; N.C. Const., Art. I, § 27; N.D. Const., Art. 1, § 11; Okla. Const., Art. 2, § 9; Tex. Const., Art. 1, § 13; *see also* S.C. Const. Art. I, § 15.

300, 314 (Wyo. 2014) (stating "[a]s a general proposition, reference to the debates for interpretation of constitutional language is appropriate only if we find the provision at issue to be ambiguous.") (citing *Rasmusen*, 50 P. at 824). Mr. Hicks identifies one delegate who offered a definition of "unusual" at the constitutional convention with respect to Section 14 and acknowledges the journals and debate on the Wyoming Constitution do not contain any commentary on Section 15. Because this appeal does not involve ambiguity in either Section 14 or 15, it is not appropriate for this Court to consider the third *Saldana* factor.

### 3. Pre-existing State Law

[¶70] The fourth *Saldana* factor considers previously established bodies of state law. *Saldana*, 846 P.2d at 622. Under this factor, this Court has looked to territorial laws to help define the scope of a later established constitutional provision. *See Mogard*, ¶¶ 13-14, 32 P.3d at 317-18 (discussing territorial code in the context of a defendant's constitutional right to counsel under Wyo. Const., art. 1, §10) (citing *Gunwall*, 720 P.2d at 812).

[¶71] Mr. Hicks maintains "Wyoming was very progressive in the areas of education and civil rights during its time as a territory" but offers no examples in the criminal justice or sentencing context. Wyoming's earliest territorial criminal code carried mandatory sentences for first- and second-degree murder. *See* 1869 Wyo. Sess. Laws 101, ch. 3, title. III, §§ 15-16 (mandatory capital punishment for first-degree murder and a mandatory "kept at hard labor during life" sentence for second-degree murder). The Territorial Legislature also set the age of both infancy and competency for crimes and misdemeanors. *See* 1869 Wyo. Sess. Laws 98, ch. 3, Title. I, §§ 3-4 (establishing competency at age 14 "if such person know[s] the distinction between good and evil" and defining "infant" as those under age ten). These criminal laws were in effect when the 1889 Wyoming Constitution was drafted and remained effective upon Statehood. *See* Wyo. Rev. Stat., title 10, ch. 1, §§ 856-57; ch. 2, §§ 870-71 (1887); *see also Bd. of Cnty. Comm'rs, Crook Cnty. v. Rollings Inv. Co.*, 27 P. 683, 684 (Wyo. 1891) (stating territorial laws in force at admission "and not repugnant to the constitution" are continued by force until the laws expire, are altered, or repealed). Wyoming then maintained a mandatory capital sentence for first-degree murder until 1915. *See* 1915 Wyo. Sess. Laws 84, ch. 87, § 1 (stating those guilty of first-degree murder shall suffer death or at the jury's qualification be sentenced to "imprisonment, at hard labor, for life."). Notwithstanding the adoption of the Wyoming Constitution, our early criminal statutes reflect a legislature that exercised its authority to enact mandatory sentences and determine the age of majority for culpability. *See Johnson*, ¶ 37, 61 P.3d at 1249 (noting life imprisonment for homicide "is a time honored and entirely humane method of punishing that crime").

[¶72] At the time of ratification, Wyoming's criminal code included mandatory sentences for murder and established an age for criminal culpability. We find this factor

unequivocally works against Mr. Hicks' argument that the Wyoming Constitution affords broader protections for emerging adults than the Eighth Amendment.

### 4. Matters of Particular State or Local Concern

[¶73]  The final *Saldana* factor considers whether the subject matter is local in character, or whether there is a need for national uniformity.  *Mogard*, ¶ 15, 32 P.3d at 318.  Mr. Hicks maintains that states retain substantial authority to enact *Miller*-style protections.

[¶74]  Federal courts have consistently recognized it is a state prerogative to determine how to punish violations of state law.  *See Payne v. Tennessee*, 501 U.S. 808, 824 (1991) ("Under our constitutional system, the primary responsibility for defining crimes against state law [and] fixing punishments for the commission of these crimes … rests with the States."); *see also Ewing v. California*, 538 U.S. 11, 24-25 (2003) ("[O]ur tradition of deferring to state legislatures in making and implementing such important [sentencing] policy decisions is longstanding"); and *Jones v. Mississippi*, 593 U.S. 98, 119-20 (2021) (discussing how determining the proper sentence for murder, particularly where the perpetrator is young, "raises profound questions of morality and social policy" made by States when enacting their sentencing laws).  Accordingly, the role of federal courts "is to safeguard the limits imposed by the Cruel and Unusual Punishments Clause of the Eighth Amendment."  *Jones*, 593 U.S. at 120.

[¶75]  Our rulings similarly reflect the State's sovereign interest in enacting its own penal code.  Fixing prison terms for specific crimes involves a substantive penological judgment. *Counts v. State*, 2014 WY 151, ¶ 22, 338 P.3d 902, 907 (Wyo. 2014) (citations omitted). And in the exercise of that judgment, we have said:

> The power to determine what acts shall constitute crimes, and what acts shall not, and to prescribe punishment for acts prohibited belongs to the legislative branch of government. This power is said to be inherent in the state legislature and it is also comprehended in the general grant of legislative power contained in the state constitution.  The power is exclusive and is not shared by the courts. So long as constitutional prohibitions are not infringed, the will of the legislature in this respect is absolute.  But the power to define crimes is of course subject to the limitations contained in state and federal constitutions.

*Sorenson v. State*, 604 P.2d 1031, 1036-37 (Wyo. 1979) (citing 21 Am.Jur.2d Criminal Law § 14 (1965)); *see also Hodgins v. State*, 706 P.2d 655, 658 (Wyo. 1985) ("The punishment for a crime is within the province of the legislature.").

[¶76] We are reluctant to find a matter of local concern when the federal and state constitutions afford the same rights. *See, e.g., Mogard*, ¶ 16, 32 P.3d at 318 (discussing how the right to counsel, enshrined in both federal and state constitutions, is unlike the examples of "local concern" noted by the United States Supreme Court); *see also Gunwall*, 720 P.2d at 813 n.11 (summarizing examples). Mr. Hicks, however, frames his appeal on the grounds that the Wyoming Constitution affords broader protection than the Eighth Amendment. *See Washington v. Foster*, 957 P.2d 712, 723 (Wash. 1998) (stating the local concern factor requires Courts to determine "in the context of the particular case" presented whether it is a matter of such singular state interest that should be interpreted independently of the federal constitution) (en banc). In answering that type of question, we have considered the final *Saldana* factor helpful. *See Fertig v. State*, 2006 WY 148, ¶ 16, 146 P.3d 492, 497 (Wyo. 2006) (applying the pre-existing state law and matters of local concern factors in search and seizure context).

[¶77] Given the United States Supreme Court's statements on this matter, our own rulings, and the distinct textual provisions in the Wyoming Constitution, we conclude the issue presented is a matter of State interest. While not dispositive, the final *Saldana* factor weighs in favor of concluding the Wyoming Constitution contains broader protections than the Eighth Amendment.

### 5. The Wyoming Constitution is distinct from the Eighth Amendment but does not support categorical protections for emerging adults.

[¶78] Article 1, Sections 14 and 15 of the Wyoming Constitution are textually distinct and afford different sentencing protections than the Eighth Amendment.

[¶79] The use of the disjunctive "cruel or unusual" in Article 1, Section 14, is substantive and purposeful. And unlike the Eighth Amendment, a challenger is only required under Section 14 to show that the sentence was either cruel or unusual before they are entitled to relief. *Norgaard*, ¶ 23, 339 P.3d at 274.

[¶80] Article 1, Section 15, adopts two penological justifications for the penal code and has no equivalent in the Eighth Amendment. Section 15 provides different sentencing protections because it requires the Legislature to frame the criminal code around the humane principles of reformation and prevention — meaning a statute is categorically unconstitutional if the challenger shows the punishment does not reflect these two purposes. Much like this case, parties may challenge the constitutionality of their sentence under either Article 1, Section 14 or 15, or both.

[¶81] While Mr. Hicks is correct that Article 1, Sections 14 and 15 are textually unique from the Eighth Amendment, those distinctions do not impart the type of broader categorical protection he contends exist in the Wyoming Constitution for emerging adults.

We now consider whether the sentencing statutes used to sentence Mr. Hicks violate the relevant provisions in the Wyoming Constitution.

## II. Mr. Hicks has not demonstrated the sentencing statutes at issue violate Article 1, Section 15 of the Wyoming Constitution.

[¶82]  Mr. Hicks also challenges the constitutionality of Wyoming Statutes §§ 6-2-101(b) (2004) (first-degree murder penal provision); 6-1-201(b)(iii) (2024) (accessory before the fact – same punishment as the principal); and 6-10-301 (2024) (life without parole provisions).  He maintains the sentencing statutes are "separately unconstitutional" under Article 1, Section 15.  But as an initial matter, Mr. Hicks argues this Court should abandon its standard for reviewing the constitutionality of state statutes.

### A. The "unconstitutionality beyond any reasonable doubt" standard of review is deeply rooted in state court practice.

[¶83]  This Court generally uses the following standard when reviewing the constitutionality of a Wyoming law:  "Statutes are presumed to be constitutional, and we will resolve any doubt in favor of constitutionality."  *Vaughn v. State*, 2017 WY 29, ¶ 7, 391 P.3d 1086, 1091 (Wyo. 2017) (citing *Kammerer v. State*, 2014 WY 50, ¶ 5, 322 P.3d 827, 830 (Wyo. 2014)).  In most cases, the appellant bears the burden of proving the statute is unconstitutional.  Normally, this burden is heavy in that appellant must clearly and exactly show the unconstitutionality beyond any reasonable doubt.  *Michael v. Hertzler*, 900 P.2d 1144, 1146 (Wyo. 1995) (quoting *Miller v. City of Laramie*, 880 P.2d 594, 597 (Wyo. 1994)).[10]

[¶84]  Mr. Hicks contends the standard is "strange," questions its origin, and discusses its struggle to gain acceptance by the United States Supreme Court.  Mr. Hicks then argues that the Court should abandon its existing standard of review entirely.

[¶85]  Wyoming's early Territorial Supreme Court laid the foundation for our standard of review.  In 1886, the Territorial Court reviewed the validity of a territorial bond statute and stated:

> If there were reasonable doubt upon the question of "inconsistency" raised by plaintiff in error, we should still sustain the law in question. The authorities are abundant that

---

[10] We acknowledge this rule of law does not apply where a citizen's fundamental constitutional right is involved. *Hardison v. State,* 2022 WY 45, ¶ 5, 507 P.3d 36, 39 (Wyo. 2022).  Mr. Hicks does not present that issue to this Court although he notes elements of the Eighth Amendment have been incorporated to the states and suggests that is relevant to our standard of review under Section 15.  Our *Saldana* analysis, however, reveals Article 1, Section 15, has no analog in the Eighth Amendment.

21

the courts should not set aside an act of the legislature merely because there may be doubts of its validity or constitutionality. Chief Justice SHAW informs us that courts will "never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt. A reasonable doubt must be solved in favor of the legislative action, and the act be sustained."

*Swan v. United States*, 9 P. 931, 933 (Wyo. Terr. 1886). Although the Territorial Court does not attribute the text quoted in *Swan*, it is a verbatim recitation from a treatise written by Thomas Cooley, Chief Justice of the Michigan Supreme Court.

Judicial Doubts on Constitutional Questions. It has been said by an eminent jurist, that when courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and **never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond a reasonable doubt. A reasonable doubt must be solved in favor or legislative action, and the act be sustained.**

Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union, 182 (1st ed. 1868) (emphasis added) (citing *In re Wellington*, 16 Pick. 95, 33 Mass. 87 (Mass. 1834)) (SHAW, C.J.) (other citations omitted) (hereinafter "*Constitutional Limitations*").

[¶86] The cited treatise, *Constitutional Limitations*, captured state court practice at the time and is credited with influencing other states that adopted versions of the beyond a reasonable doubt standard. *See* Derek Webb, *The Lost History of Judicial Restraint*, 100 Notre Dame L. Rev. 289, 336 (2024) (noting between 1881 and 1904, at least twelve state supreme courts adopted the standard for the first time). The treatise also documented a general acceptance of judicial restraint by courts of that era, a principle present in rulings during Wyoming's territorial period and in early statehood. Webb, 100 Notre Dame L. Rev. at 343-45, 346-52 (discussing increasing state adoption of the standard and growing use in treatises); *see also Wagner v. Harris,* 1 Wyo. 194, 201-02 (Wyo. Terr. 1875) (declining to consider whether a local charter was "unwise and impolitic," stating courts will not declare a law unconstitutional "unless its opposition to the fundamental law is clear and plain."); *In re Bd. of Comm'rs of Johnson County*, 32 P. 850, 854 (Wyo. 1893) (refraining from addressing policy arguments regarding the need for a new judicial district

22

stating "this court had no right and no disposition to invade the domain of the legislative branch."); and *State ex rel. Wyoming Agr. College v. Irvine*, 84 P. 90, 106 (Wyo. 1906) (stating "[t]he Constitution and laws have not vested in the courts the right to determine the policy of the state in legislative matters" in dispute challenging the statute creating the Wyoming Agriculture College).

[¶87] In 1893, Professor James B. Thayer summarized the three prevailing, and interrelated, constitutional standards of review that had developed in American jurisprudence up until that point: (1) the presumption of constitutionality; (2) the clear error rule; and (3) the reasonable doubt standard. James B. Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law*, 7 Harv. L. Rev. 129, 141-46 (1893) (discussing the presumption of constitutionality in South Carolina, the plain and clear error standard in Virginia, and the beyond a reasonable doubt standard in Massachusetts); *see also* Webb, 100 Notre Dame L. Rev. at 294. Practically every state has articulated a clarity or clear error requirement for constitutional review, and most state courts have also adopted a reasonable-doubt-style formulation. *See* Christopher R. Green, *Clarity and Reasonable Doubt in Early State-Constitutional Judicial Review*, 57 S. Tex. L. Rev. 167, 176-82 (2018) (survey of early clarity and reasonable-doubt requirements).

[¶88] Early Wyoming Supreme Court rulings captured these principles in various forms. *See, e.g., State v. Sureties of Krohne*, 34 P. 3, 7 (Wyo. 1893) (stating "[i]t is the duty of a court to denounce as unconstitutional only such statutes as are clearly and palpably violations of the fundamental law."); *Farm Inv. Co. v. Carpenter*, 61 P. 258, 264 (Wyo. 1900) (recognizing the principle that "a statute is to receive every presumption in favor of its validity, and is not to be overthrown by the courts unless it is clearly unconstitutional."); *State v. Snyder*, 212 P. 758, 759 (Wyo. 1923) (applying the beyond a reasonable doubt standard and stating a statute "must be upheld, and that all doubts are resolved in favor of the constitutionality of the act."). While this Court has not always used the same language to describe its standard of review, our early cases demonstrate that we have consistently required litigants seeking to declare a statute unconstitutional to carry a heavy burden. *See Stephenson v. Mitchel ex rel. Workmen's Comp. Dep't*, 569 P.2d 95, 97 (Wyo. 1977) (stating "it is well settled that statutes are presumed to be constitutional unless affirmatively shown to be otherwise, and one who would deny the constitutionality of a statute has a heavy burden."). And our standard today continues to reflect the presumption that statutes are constitutional and that challengers carry a heavy burden to show a statute is unconstitutional by clearly and exactly showing the unconstitutionality beyond any reasonable doubt. *See, e.g., Hardison*, ¶ 5, 507 P.3d at 39.

[¶89] Mr. Hicks also argues we should abandon the standard because the United States Supreme Court long ago stepped away from the "unconstitutional beyond a reasonable doubt" standard in its own practice. The United States Supreme Court initiated the shift when it held the 1875 Civil Rights Act unconstitutional. *See The Civil Rights Cases*, 109 U.S. 3 (1883); *abrogation recognized in United States v. Hatch*, 722 F.3d 1193, 1199 (10th

Cir. 2013); *see also* Webb, 100 Notre Dame L. Rev. at 345-46 (discussing how the "leading rule" moved into the dissent at the Supreme Court). As Justice John Marhall Harlan identifies in his sole dissent, the majority deviated without applying the presumption of constitutionally, the clear error rule, or beyond a reasonable doubt standard in its reasoning *See id.*, 109 U.S. at 27 (Harlan J., dissenting) (discussing *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 128 (1810); and *Sinking Fund Cases*, 99 U.S. 700, 718 (1879)). After *The Civil Rights Cases,* the beyond a reasonable doubt standard of review appeared primarily in dissents before the United States Supreme Court ultimately moved toward "a more active jurisprudential orientation" in the twentieth century. Webb, 100 Notre Dame L. Rev. at 359-60. While instructive, we must also consider that state constitutions serve a different purpose under federalism.

[¶90] "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533 (2012). Rather than granting general authority to perform all the conceivable functions of government, the United States Constitution lists, or enumerates, the federal government's powers. *Id.* at 534. But States possess broad police powers, and state constitutions play an entirely different role. *See State v. Langley,* 84 P.2d 767, 770 (Wyo. 1938) (recognizing a state's police power "is an attribute of sovereignty" and "inherent in the legislature except as expressly limited.").[11] For instance, the Wyoming Legislature "exercises plenary legislative power" except when limited by either the Wyoming or United States Constitution. *Greenwalt v. Ram Rest. Corp. of Wyoming*, 2003 WY 77, ¶ 16, 71 P.3d 717, 724 (Wyo. 2003); *State v. Johnson Cnty. High Sch.*, 5 P.2d 255, 261 (Wyo. 1931) ("The lawmaking power of the state, it is said in one case, recognizes no restraints and is bound by none, except such as is imposed by the Constitution.") (quoting Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union, 355 (8th ed. 1927).[12] Because the federal constitution is situated differently than state constitutions, the distinction has warranted a different approach for state courts.

[¶91] The "unconstitutionality beyond a reasonable doubt" standard is deeply rooted in Wyoming jurisprudence and state court practice. We are not convinced by the claim that the United States Supreme Court applies a different perspective to constitutional arguments. State courts have independently shaped their own approaches to interpreting liberty and property protections under their respective state constitutions. "Under the doctrine of *stare decisis,* we depart from precedent only upon due reflection and only if we are convinced that it is necessary to vindicate plain, obvious principles of law and remedy

---

[11] *See also* Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law 16 (2018) ("Nothing compels the state courts to imitate federal interpretations of the liberty and property guarantees found in the U.S. Constitution when it comes to the rights guarantees found in their own constitutions[.]").

[12] In *Johnson County High School,* the Court seemingly cited an edition of *Constitutional Limitations* that is no longer available at the Wyoming State Law Library. Our citation here is to the Eighth Edition.

continued injustice." *Bernard v. State*, 2025 WY 66, ¶ 14, 570 P.3d 416, 420 (Wyo. 2025) (internal quotations and citations omitted).  Mr. Hicks' general skepticism of our existing approach has failed to convince the Court that departing from the "unconstitutionality beyond any reasonable doubt" standard of review is warranted.

## B.    Mr. Hicks has not demonstrated that the sentencing statutes at issue are unconstitutional under Article 1, Section 15.

[¶92]  Article 1, Section 15 requires the Legislature to frame the penal code "on the humane principles of reformation and prevention."  Wyo. Const., art. 1, § 15.  This provision requires sentencing statutes, at a minimum, to serve both purposes.  *See Nicodemus*, ¶ 34, 392 P.3d at 416 (rejecting argument "that article 1, section 15 limits the objectives that may be served by a sentencing statute").  A sentencing statute is humane if its purpose reflects the principles of reformation and prevention.  *See id.*, ¶¶ 33-35, 392 P.3d at 416 (evaluating the objectives of the statute to determine whether the provision contravened Article 1, Section 15).

[¶93]  Mr. Hicks contends his mandatory life without parole sentences do not serve a reformative purpose.  In support of his argument, Mr. Hicks quotes the United States Supreme Court*,* "[a] sentence of life imprisonment without parole [ ] cannot be justified by the goal of rehabilitation.  The penalty forswears altogether the rehabilitative ideal.  By denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person's value and place in society."  *Graham*, 560 U.S. at 74.

[¶94]  Mr. Hicks' reliance on *Graham* is misplaced.  The Wyoming Constitution requires "reformation" not rehabilitation. Wyo. Const., art. 1, § 15.  Mr. Hicks conflates the words to suggest reformation *requires* reentry into society.  We have already concluded that this Court focuses on the text of the constitution, not vague criminal justice theories.  *See* Discussion of Constitutional Issues at I.A.4. (citing *Rasmussen* and *Bordewick*).  And we are reluctant to follow Mr. Hicks' reasoning when *Graham* acknowledges that "[t]he concept of rehabilitation is imprecise" and its application remains subject to "a substantial, dynamic field of inquiry and dialogue."  *Graham*, 560 U.S. at 73.

[¶95]  Reformation means "to induce or cause to abandon an evil manner of living and follow a good one:  change from worse to better" such as attempts to reform a criminal. *Reformation*, Webster's Third New International Dictionary (2023); *see also Reformative Punishment* (1919), Black's Law Dictionary (9th ed. 2009) ("Punishment intended to change the character of the offender.").  The definition of reformation plainly centers on correcting an offender's character.  While change in character may manifest itself in various forms — e.g., treatment, vocational training, educational programming, spiritual guidance, or peer support during incarceration — the definition of reformation does not

require release or reentry of an offender.[13]  This Court came to a similar conclusion when it was previously asked to consider whether an offender's consecutive life sentences violated Article 1, Section 15, because it prevented him from returning to society, and we determined it did not.  *Castle v. State*, 842 P.2d 1060, 1061 (Wyo. 1992).

[¶96]  Mr. Hicks has not met his burden of demonstrating that Wyo. Stat. Ann. §§ 6-2-101(b) (2004), 6-1-201(b)(iii) (2024), and 6-10-301 (2024) are unconstitutional beyond any reasonable doubt.  The Wyoming Constitution expressly authorizes the Legislature to "create a penalty of life imprisonment without parole for specified crimes."  Wyo. Const., art. 3, § 53.  The Legislature enacted such a punishment for the crimes committed, and without any showing the challenged statutes fail to fulfill the dual penological principles mandated in Article 1, Section 15, we find no constitutional violation.

### III.    Mr. Hicks' sentences are not cruel or unusual under Article 1, Section 14.

[¶97]  Mr. Hicks maintains his mandatory life without parole sentences are "cruel or unusual" under Article 1, Section 14, of the Wyoming Constitution.  First, he argues this Court should adopt a *Miller*-type approach for evaluating the constitutionality of punishments based upon the federal "evolving standards of decency framework."  Next, Mr. Hicks argues emerging adults are "constitutionally different" from adults.  Finally, he maintains those differences make his sentences both cruel and unusual under Article 1, Section 14.  Having already determined that the text of the Wyoming Constitution alone does not afford the type of categorical constitutional relief Mr. Hicks seeks, we will proceed to his remaining arguments starting with the framework for reviewing his Section 14 claim.

[¶98]  Our framework for evaluating a challenge under Article 1, Section 14 shares commonalities with Eighth Amendment jurisprudence.  Like the Eighth Amendment, the Wyoming Constitution's prohibition against cruel or unusual punishment prohibits punishment that is grossly disproportionate to the gravity of the crime.  *Martinson*, ¶ 29, 534 P.3d at 921 (citations omitted).  To determine whether a punishment is proportional under Article 1, Section 14, we previously applied the following federal test:

> (i) the gravity of the offense and the harshness of the penalty;
> (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions[.]

*Villafana v. State*, 2022 WY 130, ¶ 29, 519 P.3d 300, 308 (Wyo. 2022) (quoting *Solem v. Helm*, 463 U.S. 277, 292 (1983)) (internal quotations omitted) ("*Solem* factors").  Mr. Hicks wants the Court to reconsider the *Solem* factors and adopt a standard for Section 14

---

[13] We acknowledge Mr. Hicks' record of reformation while serving his sentence.

that more closely aligns with federal precedent. His argument requires us to evaluate the progeny of *Miller* and consider whether there are state constitutional grounds for adopting the evolving standards of decency approach.

### A. The evolving standards of decency approach is unique to Eighth Amendment jurisprudence.

[¶99] Mr. Hicks asks this Court to review his sentences using "the most protective" test possible under state constitutional analysis. Although he acknowledges this Court has consistently applied the grossly disproportionate standard above, Mr. Hicks argues the Court should instead "extend the *Miller*-approach" used, at times, by the United States Supreme Court. Also known as the "evolving standards of decency" framework, Mr. Hicks maintains the *Miller* approach would have us consider the scientific consensus, social beliefs, penological justifications, and an individualized sentencing approach when evaluating his sentence. Specifically, Mr. Hicks contends the *Miller* approach is appropriate here because he is a member of a class of offenders challenging mandatory life without parole sentences and the grossly disproportionate test is "more offender and sentence specific."

[¶100] The evolving standards of decency approach is unique to Eighth Amendment jurisprudence. *See Trop v. Dulles*, 356 U.S. 86, 101 (1958) ("The [Eighth Amendment] must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.") (plurality opinion). Since its inception, the United States Supreme Court has applied evolving standards of decency in select instances. Although it was announced in a non-capital case, the standard was initially applied in death penalty cases. In *Furman*, three of the five justices forming a per curium opinion relied on evolving standards of decency to strike down capital punishment. *Furman v. Georgia*, 408 U.S. 238 (1972). The Supreme Court, in *Gregg,* then relied on the standard to arrive at an opposite result, upholding the death penalty. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). There, the plurality questioned the prior court's application of "subjective judgment" and stated courts should instead "look to objective indicia that reflect the public attitude toward a given sanction" because public perceptions of decency "are not conclusive." *Id.*, 428 U.S. at 173.

[¶101] The Supreme Court continued to apply the evolving standards of decency approach to strike down the death penalty for certain classes of offenders. *See Atkins v. Virginia*, 536 U.S. 304 (2002) (vulnerable defendants, such as those with intellectual disabilities); *Roper*, 543 U.S. 551 (juveniles); *and Ford v. Wainwright*, 477 U.S. 399 (1986) (offenders developing incompetencies prior to execution). The Supreme Court also applied the approach when invalidating capital punishment for non-homicide crimes. *See Coker v. Georgia*, 433 U.S. 584 (1977) (rape of adults); *Kennedy v. Louisiana*, 554 U.S. 407 (2008) (rape of children); *and Tison v. Arizona*, 481 U.S. 137, 158 (1987) (certain instances of felony murder). When the Supreme Court invalidated mandatory death sentences, it

similarly relied on the evolving standards of decency approach. *Roberts v. Louisiana,* 428 U.S. 325 (1976).

[¶102] For several decades, the Supreme Court limited its use of the evolving standards of decency to capital cases and reviewed non-capital punishments under a grossly disproportionate test, noting its "reluctance to review legislatively mandated terms of imprisonment." *Rummel v. Estelle*, 445 U.S. 263, 274 (1980). It was understood that death is different and warranted stricter review. *See Furman*, 408 U.S. at 286-87 (noting "[d]eath is a unique punishment in the United States" and discussing the punishment as the ultimate sanction) (Brennan, J., concurring).

[¶103] In 2010, the Supreme Court deviated from this distinction and applied evolving standards of decency in a non-capital setting. *See Graham*, 560 U.S. at 58 (invoking the approach in holding the Eighth Amendment prohibits life without parole sentences for juvenile offenders who did not commit a homicide). And as Mr. Hicks notes, the Supreme Court also relied on the same approach to conclude mandatory life without parole sentences for those under age eighteen violated the Eighth Amendment. *Miller*, 567 U.S. at 469-70. Since *Miller*, however, the Supreme Court has been reluctant to take the evolving standards of decency approach, including in challenges to methods of execution. *See, e.g., Glossip v. Gross*, 576 U.S. 863 (2015) (affirming denial of preliminary injunction by capital offender claiming the use of midazolam in lethal injection violates the Eighth Amendment); *Bucklew v. Precythe*, 587 U.S. 119 (2019) (affirming dismissal of capital offender's challenge to the method of his execution).

[¶104] Mr. Hicks now asks us to enter the fray by adopting the approach because "it aligns" with the disjunctive nature of Article 1, Section 14. This Court has discussed evolving standards of decency in Eighth Amendment challenges. *See, e.g., Bear Cloud III*, 334 P.3d at 138. But we have expressed doubt when confronted with the standard in the context of Article 1, Section 14. *See, e.g., Norgaard*, ¶ 29, 339 P.3d at 276.

[¶105] We are not inclined to inject the evolving standards of decency approach from federal jurisprudence into Wyoming constitutional analysis for several reasons. First, this Court has already determined the Wyoming Constitution does not support the type of categorical protection Mr. Hicks seeks. *See* Discussion of Constitutional Issues at I.B.5. That alone undermines his primary argument for adopting the *Miller*-approach because the only remaining claim for this Court to settle is the "offender and sentence specific" challenge that Mr. Hicks conceded at oral argument is best suited for the grossly disproportionate framework.

[¶106] Second, distinctions between the Wyoming Constitution and the Eighth Amendment support a different approach. We cannot overlook the purposeful use of disjunctive language in Article 1, Section 14. Adopting a legal test that respects the unique language of the Wyoming Constitution is consistent with the primacy this Court affords to

28

independent state constitutional analysis. *See Joseph v. State*, 2023 WY 58, ¶ 18, 530 P.3d 1071, 1075 n. 2 (Wyo. 2023) (emphasizing "the primacy of the state constitutional analysis and the need for it to be conducted separately from any federal analysis").

[¶107]  Third, this Court's approach to Article 1, Section 14, has its own history that looked broadly at the views of society and considered its response to the punishment at issue. *See In re McDonald*, 33 P. 18, 21 (Wyo. 1893) (stating "in order to declare the law unconstitutional, that the punishment provided by the law is so disproportionate to the offense as to shock the moral sense of the people.") (citation omitted); *see also Fisher*, 64 P. at 1061 (stating for a Court to find a punishment cruel or unusual, it should be so out of proportion to the offense as to shock the moral sense of the people or "so excessive or so cruel as to meet the disapproval and condemnation of the conscience and reason of men generally.") (quoting *State v. Becker*, 51 N.W. 1018, 1022 (S.D. 1892)).  Our earliest interpretation of Section 14 was delivered nearly sixty-five years before the United States Supreme Court sowed the seeds for its evolving standards of decency standard. *See Trop*, 356 U.S. at 101.  While this Court has discussed the evolving standard of decency test in the context of the Eighth Amendment, we have not historically adopted or applied the approach in our Section 14 analysis. *See, e.g., Norgaard*, ¶¶ 9, 29, 339 P.3d at 270, 276.

[¶108]  Finally, we are cognizant that the evolving standards of decency framework has long faced criticism for availing itself to subjective views of judges. *See, e.g., Furman*, 408 U.S. at 383 (arguing the test lacks "judicially manageable criteria") (Burger, C.J., dissenting);  *Roper*, 543 U.S. at 616-18 (arguing the approach improperly makes judges the authoritative voice on identifying the moral consensus of the American people) (Scalia, J., dissenting); *see also Miller*, 567 U.S. at 510-15 (discussing the United States Supreme Court's gradual shift away from objective criteria since introducing the standard) (Alito, J., dissenting).  When confronted with the reality that public sentiment toward criminal punishment is not static, this Court has embraced "objective indicia" to capture contemporary perspectives as opposed to searching for its own subjective position. *See Hopkinson v. State*, 632 P.2d 79, 151-52 (Wyo. 1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173-75 (1976) and finding its discussion compelling, including its recognition that "public perceptions of standards of decency with respect to criminal sanctions are not conclusive.")).

[¶109]  The evolving standards of decency approach was designed for Eighth Amendment jurisprudence, and we have trouble finding legal support for the standard in the text and our interpretations of the Wyoming Constitution.  This Court does not blindly adhere to federal precedent when interpreting our constitution because the Wyoming Constitution is "a separate and independent source of protection" for its residents. *Fertig*, ¶ 17, 146 P.3d at 497 (quoting *O'Boyle v. State*, 2005 WY 83, ¶ 23, 117 P.3d 401, 408 (Wyo. 2005)).  Accordingly, we decline to incorporate the standard into our Article 1, Section 14, analysis.

**B. Article 1, Section 14 requires a bifurcated analysis as to what constitutes a cruel or an unusual punishment.**

[¶110] Our review of the Wyoming Constitution and our *Saldana* analysis lead us to conclude that Article 1, Section 14, requires a bifurcated approach for analyzing what constitutes either a cruel or an unusual punishment. Eighth Amendment jurisprudence largely incorporates the same principles this Court has traditionally considered when evaluating claims under Article 1, Section 14 — proportionality and comparing punishments with those in other jurisdictions to evaluate contemporary standards. However, the Eighth Amendment approach analyzes "cruel and unusual" together and is incompatible with the plain language of the Wyoming Constitution. We start by examining the primary principles underlying Article 1, Section 14.

[¶111] This Court relied on proportionality to examine whether a punishment was cruel before the United States Supreme Court adopted proportionality as a standard. *See In re McDonald*, 33 P. at 21 (recognizing, in 1892, that punishments must be "so disproportionate to the offense as to shock the moral sense of the people" to declare them unconstitutional) (quoting *Michigan v. Morris*, 45 N.W. 581, 592 (Mich. 1890)); *see also* John F. Stinneford, *Rethinking Proportionality Under the Cruel and Unusual Punishments Clause*, 97 Va. L. Rev. 899, 947-52 (2015) (discussing how state courts and state constitutions played a controlling role in developing proportionality analysis). When this Court first applied proportionality, the United States Supreme Court was still grappling with the concept. *See, e.g., O'Neil v. Vermont*, 144 U.S. 323, 339-40 (1892) (arguing the Eighth Amendment prohibits "all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged.") (Fields, J., dissenting).

[¶112] The United States Supreme Court first announced its proportionality requirement in 1910. *See Weems v. United States*, 217 U.S. 349, 368 (1910) (stating punishment for crime should be "graduated and proportioned to offense."). And the Supreme Court firmly ensconced proportionality into its Eighth Amendment jurisprudence in *Solem*. *See Solem*, 463 U.S. at 292 (reiterating proportionality in *Solem* factors). Ever since, however, detractors of the principle have sought to narrow its role arguing proportionality has no basis in the Eighth Amendment. *See, e.g., Harmelin,* 501 U.S. at 988-90, 994 (arguing that the text and history of the Eighth Amendment does not support proportionality) (Scalia, J, plurality).

[¶113] None of the parties challenge this Court's past or present application of proportionality to determine whether a punishment is grossly disproportionate to the offense. This Court primarily relies on proportionality to determine if a punishment is excessive or cruel. *Fisher*, 64 P. at 1061 (stating a punishment "to be held excessive" … "should be so out of proportion to the offense as to shock the moral sense of the people."). Wyoming is similarly not alone in evaluating whether the relationship between the crime and the punishment offends, broadly, community standards. *See, e.g., Green v. Alaska*,

390 P.2d 433, 435 (Alaska 1964) (punishment so disproportionate "to be completely arbitrary and shocking to the sense of justice"); *Missouri v. Bell*, 719 S.W.2d 763, 766 (Mo. 1986) (punishment so disproportionate "as to shock the moral sense of reasonable people"); *Montana v. Paulsrud*, 285 P.3d 505, 67 (Mont. 2012) (punishment so disproportionate "it shocks the conscience and outrages the moral sense of the community or of justice"); *Oregon v. Gonzalez*, 564 P.3d 109, 254 (Or. 2025) (punishment so disproportionate it "shocks the moral sense of reasonable people"); *Utah v. Houston*, 353 P.3d 55, 76 (Utah 2015) (punishment so disproportionate "it shock[s] the moral sense of all reasonable men as to what is right and proper under the circumstances"); *West Virginia v. Cooper*, 304 S.E.2d 851, 857 (W. Va. 1983) (punishment so disproportionate it "shocks the conscience of the court and society"). Therefore, we find proportionality a necessary component of our state constitutional analysis in determining whether a challenged punishment is cruel.

[¶114]   This Court has also considered laws in other jurisdictions to evaluate the constitutionality of a punishment. *See Fisher*, 64 P. at 1061 (comparing contempt punishments in three other states); *Oakley*, 715 P.2d at 1376-77 (identifying *Solem* factors as a viable approach for evaluating Article 1, Section 14 challenge); and *Norgaard*, ¶¶ 31-34, 339 P.3d at 276-77 (comparing the sentencing laws of other states). Such jurisdictional comparisons provide the Court with objective criteria to measure contemporary views on a particular punishment. *See Martin v. State*, 720 P.2d 894, 897 (Wyo. 1986) (recognizing "[j]udicial discretion is a composite of many things, among which are conclusions drawn from objective criteria" in a sentencing challenge) (citation omitted).

[¶115] When it comes to evaluating contemporary values, the laws enacted by other state legislatures provide "the clearest and most reliable objective evidence of contemporary values[.]" *Graham*, 560 U.S. at 62 (quoting *Atkins v. Virginia*, 536 U.S. 304, 312 (2002)). This Court has similarly considered the rulings of other state courts in its analysis. *See Johnson*, ¶ 37, 61 P.3d at 1249 (comparing state court decisions affirming various punishments for child abuse homicide). We find the laws of other states and other court rulings an appropriate element of our Section 14 analysis when determining whether a punishment is unusual by contemporary standards.

[¶116] This Court "must attempt to give meaning to all words" when interpreting the constitution. *Powers*, ¶ 32, 318 P.3d at 313 (citing *Geringer*, 10 P.3d at 520). To give meaning to the disjunctive "cruel or unusual" language in Article 1, Section 14, we decline to use the combined three *Solem* factors derived from Eighth Amendment case law and apply the following separate tests under the Wyoming Constitution. First,

> A punishment is "**cruel**" under Article 1, Section 14 if the punishment is so grossly disproportionate to the offense that it shocks the moral sense of the people.

[¶117] The Court first considers the gravity of the offense and the harshness of the penalty. *Martinson*, ¶ 29, 534 P.3d at 921. The elements of the offense are not viewed in a vacuum; the Court also looks at the offender's actual criminal conduct. *Norgaard*, ¶ 14, 339 P.3d at 272; *Tilley v. State*, 912 P.2d 1140, 1143-44 (Wyo. 1996) (describing the nature of the defendant's conduct); *see also Martinson*, ¶¶ 32-33, 534 P.3d at 921-22 (same). Only if the Court concludes the punishment is grossly disproportionate to the crime does it then determine whether that punishment shocks the moral sense of the people. This Court reserves its judgment that a punishment is cruel for "very extreme cases." *Fisher*, 64 P. at 1061 (quoting *Becker*, 51 N.W. at 1022).

[¶118] Second,

> A punishment is "**unusual**" under Article 1, Section 14 if the punishment is obsolete or contravenes contemporary standards as measured by a clear consensus of state legislatures or courts.

[¶119] Obsolete punishments are modes of punishment deemed antiquated by historical standards. *See In re McDonald*, 33 P. at 21 (identifying examples of obsolete punishments); *see also In re Kemmler*, 136 U.S. at 446 (discussing "the duty of courts" to invalidate punishments considered objectionable at the time of founding). To determine whether a punishment is unusual by contemporary standards we compare the punishments imposed for the commission of the same crime in other state jurisdictions. *Norgaard*, ¶ 11, 339 P.3d at 271 (quoting *Solem*, 463 U.S. at 292)). A punishment is unusual by contemporary standards when a clear consensus of state legislatures has abandoned the practice, or courts have deemed the punishment contrary to law. *See id.,* ¶¶ 27-28 (comparing jurisdictions). The mere fact a punishment is unique to Wyoming is not sufficient to demonstrate it is an unusual punishment. *See Johnson*, ¶ 37, 61 P.3d at 1249 (rejecting argument the "uniqueness" of a sentencing scheme rendered it unusual).

### C. Mr. Hicks' mandatory life without parole sentences are not cruel.

[¶120] Excluding the death penalty, Mr. Hicks asserts his three consecutive life without parole sentences constitute the most severe punishment available under Wyoming law. As to the gravity of the offense, Mr. Hicks maintains he was not the principal actor. He also argues mandatory life sentences for emerging adults are disproportionate because those individuals will spend more time in prison than other adults who commit their offenses later in life.

[¶121] Mr. Hicks is correct that a life without parole sentence is among the most severe criminal punishments that can be rendered. *Norgaard,* ¶ 12, 339 P.3d at 271 (citations omitted). However, his effort to diminish the gravity of his actions by claiming he did not serve as a principal actor overlooks the cumulative nature of his crimes. Mr. Hicks was convicted for his role not in one, but in two different murders. Even so, Mr. Hicks'

argument about non-principal actors attempts to retread old ground. This Court examined the same argument in *Bear Cloud III* where it acknowledged the potential harshness of the felony murder rule, examined it in the context of *Miller*, and concluded that the conviction of an accomplice did not warrant additional sentencing protections. *Bear Cloud III*, ¶¶ 46-47, 334 P.3d at 146. And, notably, unlike *Bear Cloud III*, Mr. Hicks had already reached the age of majority at the time of his offense and ultimate convictions.

[¶122] Mr. Hicks' argument that he will serve more time than older adult offenders convicted for the same crime is not persuasive. As a practical matter, he is asking the Court to compare *the offender* with the harshness of the penalty as opposed to "the gravity of the offense" with the "harshness of the penalty." *Martinson*, ¶ 29, 534 P.3d at 921. Although the *Miller*-approach that Mr. Hicks has asked this Court to adopt does consider the proportionality of "the offender and the offense" to the punishment, at oral argument, Mr. Hicks could not identify an instance where this Court applied that rationale in the Article 1, Section 14, setting. *See also Sen v. State*, 2017 WY 30, ¶ 14, 390 P.3d 769, 774 (Wyo. 2017) (quoting *Miller*, 567 U.S. at 469, in Eighth Amendment context).

[¶123] The prohibition on cruel punishment in Article 1, Section 14, does not require a precise calibration of crime and punishment. Rather, it prohibits punishments that are grossly disproportionate to the gravity of the crime. We find that Mr. Hicks has not demonstrated the harshness of his penalty is grossly disproportionate to the seriousness of his offenses. Having so concluded, we do not need to evaluate whether his sentences shocks the moral sense of the people.

### D. Mr. Hicks' mandatory life without parole sentences are not unusual.

[¶124] Mr. Hicks argues Wyoming is in the minority of jurisdictions that authorize mandatory life without parole for first-degree murder. Our precedent makes clear sentencing decisions must be based on reliable, documented, and accurate information. *Jewkes v. State*, 2022 WY 90, ¶ 24, 513 P.3d 154, 161 (Wyo. 2022) (citation modified). Analogously, this Court will only consider accurate, detailed, and timely data when litigants ask the Court to compare the sentencing practices in Wyoming with the laws of other states under Article 1, Section 14. The information Mr. Hicks presents is incomplete, and worse, potentially misleading.

[¶125] Instead of preparing an independent analysis citing the relevant sentencing statutes across all states, Mr. Hicks relies on a summary from a state court opinion which he concedes from the outset incorrectly categorizes Wyoming. According to that case, Mr. Hicks maintains Wyoming is either one of ten or one of twelve jurisdictions that supposedly impose *mandatory* life without parole for first-degree murder. *See Massachusetts v. Mattis*, 224 N.E.3d 410, 427 (Mass. 2024) (noting, however, that first-degree murder offenses at that time collectively carried either a discretionary or mandatory life without parole sentence in twenty-eight states). Mr. Hicks' estimate is inconsistent

with the summary provided in a more recent state court opinion which indicates sixteen states (and the federal government) impose a mandatory life without parole sentence for first-degree murder. *See Michigan v. Taylor*, -- N.W.3d --, 2025 WL 1085247 (Mich. Apr. 10, 2025) (Clement, C.J., dissenting). The discrepancy between the two summaries highlights why this Court requires litigants to prepare verifiable, independent analysis on the laws of other jurisdictions.

[¶126] Even if we relied on the jurisdictional comparisons from the two state court opinions, that data does not demonstrate Wyoming's sentencing practices contravene contemporary standards by a clear consensus. Mr. Hicks' appeal presents a three-part challenge: (1) the mandatory nature of the sentencing statute; (2) the term of the sentence; and (3) his status as an emerging juvenile at the time of the offense. The jurisdictional data presented is incomplete because it does not address the number of states that provide categorial protection for emerging adults nor does it put into perspective the fact that a form of life without parole for first-degree murder exists in a majority of states. Additionally, while Wyoming might be in the minority of states with mandatory sentencing, in this case, it does not constitute a clear consensus by contemporary values.

[¶127] Mr. Hicks notes three high courts have recently concluded mandatory life without parole sentences for emerging adults are unconstitutional or warranted additional procedural protections. *See, e.g., Mattis,* 224 N.E.3d 410, *Taylor,* -- N.W.3d --, *and In re Monschke*, 482 P.3d 276 (Wash. 2021). While informative, these three state court decisions, in the absence of reliable jurisdictional data, do not constitute a clear consensus that Mr. Hicks' sentences are unusual under Article 1, Section 14.

[¶128] Finally, Mr. Hicks asks the Court to draw upon scientific testimony to develop our conclusions about the broader views of society. He offers two affidavits for the dual purpose of demonstrating that adults between the ages of eighteen and twenty-one are cognitively different and advocating the position that social views have changed about the prevailing age of majority.

[¶129] Although the standards of the scientific community may prove an expert opinion reliable, self-directed expert testimony hypothesizing social norms is not the type of evidence this Court considers when it evaluates the constitutionality of a punishment under Article 1, Section 14. *See Villafana*, ¶ 30, 519 P.3d at 309 (dismissing speculative expert opinion stating the placement of a low-risk offender with more serious offenders was a punishment "akin to torture"); *see also Davis v. State*, 2018 WY 40, ¶ 77, 415 P.3d 666, 689 (Wyo. 2018) (suggesting courts may rely on expert evidence to draw conclusions about the maturity of a particular offender but not to question bright lines established by law). Such testimony is better suited for lawmakers who can change criminal justice policy.

[¶130] Objective criteria drives our judgment under Section 1, Article 14. *See Martin*, 720 P.2d at 897 (recognizing "[j]udicial discretion is a composite of many things, among which

are conclusions drawn from objective criteria" in a sentencing challenge) (citation omitted). To hold otherwise would permit a select few to inordinately shape this Court's judgment and stifle the same democratic processes designed to capture the contemporary views of a broader society.

[¶131] We find Mr. Hicks has not demonstrated his sentences are unusual under Article 1, Section 14.

## IV.    Mr. Hicks' sentences do not violate the Eighth Amendment.

[¶132] Despite advancing the argument that the Wyoming Constitution affords broader sentencing protections for emerging adults than the federal constitution, Mr. Hicks believes "it is not a stretch to raise" an Eighth Amendment challenge as well. He maintains that under federal precedent, juveniles and emerging adults share similar characteristics, and therefore, should receive similar treatment when sentenced. Mr. Hicks' argument regarding the Eighth Amendment is relegated to a single paragraph.

[¶133] The interpretations of the United States Supreme Court "should be and are dispositive of any federal constitutional questions raised in the courts of this state." *Bear Cloud III*, ¶ 38, 334 P.3d at 144 (quoting *Nehring v. Russell*, 582 P.2d 67, 74 (Wyo. 1978)). In support of his argument, Mr. Hicks references the *Roper/Graham/Miller* trilogy of cases from the United States Supreme Court.

[¶134] As a reminder, in *Miller*, the United States Supreme Court held that the Eighth Amendment prohibits sentencing juvenile offenders to mandatory life in prison without the possibility of parole. *Miller*, 567 U.S. at 479. *Miller* built upon *Roper*, 543 U.S. 551, which held the Eighth Amendment bars capital punishment for juveniles, and *Graham*, 560 U.S. 48, which held the Eighth Amendment prohibits imposing life without parole for nonhomicide juvenile offenders. *Id.* at 470. All three cases relied on the principle that "in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult." *Miller,* 567 U.S. at 477. Each case also deals with sentencing juveniles to either mandatory life in prison without parole or the death penalty.

[¶135] Mr. Hicks' case does not intersect any of the three federal rulings because he was not a juvenile at the time of his crimes or convictions. *See Roper*, 543 U.S. at 774 ("The age of 18 is the point where society draws the line for many purposes between childhood and adulthood."); *see also Miller*, 567 U.S. at 470 (holding that mandatory life imprisonment without parole for those under age eighteen at the time of their crimes violates the Eighth Amendment). He tacitly concedes as much, arguing throughout his brief that we should "extend" *Miller* to our state constitutional analysis because the Eighth Amendment does not afford him the relief he seeks. Because existing Supreme Court precedent does not address emerging adults and because Mr. Hicks presents no other

35

argument specific to the Eighth Amendment, we conclude Mr. Hicks' sentences do not violate the Eighth Amendment.

## V. Mr. Hicks' sentences do not violate State equal protection provisions.

[¶136] Mr. Hicks separately challenges his mandatory life without parole sentences under the equal protection provisions of the Wyoming Constitution. As a nineteen-year-old offender, Mr. Hicks maintains he was treated differently than "similarly situated" juveniles in violation of Article 1, Sections 2, 3, and 36. More specifically, he targets the exception in Wyoming's post-*Miller* first-degree murder statute which provides a different sentencing structure for individuals under the age of eighteen than those sentenced as adults. *See* Wyo. Stat. Ann. § 6-2-101(b) (2024). He also contends the Legislature's decision to draw the line between adult and juvenile at age eighteen was arbitrary.

[¶137] The principles of Wyoming's equal protection analysis are well established. *Greenwalt*, ¶ 39, 71 P.3d at 729-31. When this Court considers whether a law violates equal protection guarantees we:

> 1. Identify the legislative classification at issue;
> 2. Identify the legislative objectives;
> 3. Determine whether the legislative classification is rationally related to the achievement of an appropriate legislative purpose. In this element the court is evaluating whether the legislature's objectives justify the statutory classification.

*Greenwalt*, ¶ 40, 71 P.3d at 732. Claims of an unconstitutional classification are analyzed under two levels of scrutiny. If the class is suspect or if a fundamental right is involved, a strict scrutiny standard applies, requiring a demonstration that the classification is necessary to achieve a compelling state interest. *Hardison*, ¶ 6, 507 P.3d at 39 (citations omitted). If a suspect class or a fundamental right is not involved, a rational relationship test is used to determine if the classification has a rational relationship to a legitimate state interest. *Id.* (citations omitted).

[¶138] As a threshold matter, Mr. Hicks must identify a legislative classification in § 6-2-101(b) and show that classification treats similarly situated persons unequally. *Greenwalt*, ¶ 40, 71 P.3d at 732; *see also Hageman v. Goshen Cnty. Sch. Dist. No. 1*, 2011 WY 91, ¶ 54, 256 P.3d 487, 503 (Wyo. 2011) (stating that this Court requires "the party claiming [an equal protection] violation to first demonstrate the classification at issue treats similarly situated persons unequally.") (citation modified). If not, there is no equal protection violation, and the claim must be dismissed. *Bird v. Wyoming Bd. of Parole*, 2016 WY 100, ¶ 7, 382 P.3d 56, 61 (Wyo. 2016) (citing *Reiter*, ¶ 26, 36 P.3d at 594).

[¶139]   We are unconvinced Mr. Hicks' emerging adult classification is a creature of Wyoming statute or government action.  *See Ellett v. State*, 883 P.2d 940, 944 (Wyo. 1994) (recognizing an equal protection violation begins with "a statute or a government action" which "creates an inherently suspect classification.") (quoting *White v. State*, 784 P.2d 1313, 1315 (Wyo. 1989) (internal brackets omitted)).  The first-degree murder statute, as amended post-*Miller*, provides:  "[a] person convicted of murder in the first degree shall be punished by death, life imprisonment without parole or life imprisonment according to law," and then recognizes an exception for those convicted when "under the age of eighteen (18) years at the time of the offense."  Wyo. Stat. Ann. § 6-2-101(b) (2024).  The statute creates only two legislative classifications, those over age eighteen and those under age eighteen.

[¶140]   Mr. Hicks attempts to draw parallels with this Court's decision to strike down a three-tiered statute governing the use or possession of alcohol and other controlled intoxicants on equal protection grounds.  *See Johnson v. State Hearing Examiner's Office*, 838 P.2d 158, 160-61 (Wyo. 1992).  That statute:  (1) authorized persons over twenty-one to use and possess alcohol legally; (2) prohibited persons who are either nineteen or twenty from using alcohol but stated, if convicted, they would not lose their driver's license; and (3) provided that persons under nineteen would have their driver's license suspended if convicted for violating any law involving either alcohol or illegal drugs.  *Id.*  But *Johnson* is not analogous because the age-based legislative classifications at issue in that case were created expressly by statute — including a category expressly targeting what Mr. Hicks would consider an emerging adult.  *Id.*

[¶141]   Litigants advancing an equal protection challenge can demonstrate a statute creates a suspect legislative classification using at least three different methods.  *See State v. Laude*, 654 P.2d 1223, 1226 (Wyo. 1982) (identifying laws that create facial classifications; showing laws are impermissibly applied against identifiable classes of people; and demonstrating a law is used as a device designed to impose different burdens on different classes of people).  Because § 6-2-101(b) does not facially target emerging adults, Mr. Hicks carries the burden of identifying how application of the first-degree murder statute impermissibly targets his proposed cohort of offenders.  *See id.* (discussing the burden parties carry when the challenged statute does not involve a facial classification).  We find Mr. Hicks has not demonstrated that the first-degree murder statute categorically targets emerging adults.

[¶142]   Even if § 6-2-101(b) was applied in a manner that targeted emerging adults, Mr. Hicks must still also show the classification at issue "treats similarly situated persons unequally" before we apply any level of scrutiny.  *Hageman*, ¶ 54, 256 P.3d at 503 (quoting *Matter of ALJ*, 836 P.2d 307, 313 (Wyo. 1992)).  "Persons are 'similarly situated' if they are subject to the same circumstances and same conditions."  *Merchant v. State Dep't of Corrections*, 2007 WY 159, ¶ 18, 168 P.3d 856, 863 (Wyo. 2007) (citing *WW Ent., Inc. v. City of Cheyenne*, 956 P.2d 353, 356 (Wyo. 1998)).

[¶143] Mr. Hicks argues nineteen-year-olds and juveniles are similarly situated because there is no substantial difference between juveniles and late adolescents. We disagree. Juveniles and adult offenders are not similarly situated in the equal protection context. *See Matter of ALJ*, 836 P.2d 307, 313 (Wyo. 1992) ("By enacting a juvenile code separate from the criminal code, Wyoming's legislature has recognized that juveniles and adults are not similarly situated."); *see also Sen,* ¶ 13, 390 P.3d at 773 (noting United States Supreme Court precedent, culminating in *Miller*, has established "that children are constitutionally different from adults for purposes of sentencing[.]").

[¶144] We understand Mr. Hicks disagrees with the Legislature's decision to draw the line between adults and juveniles at eighteen years of age. But we cannot say that line was drawn arbitrarily. In response to *Miller*, the 2013 Wyoming Legislature amended the laws governing juvenile parole eligibility, stating persons convicted of first-degree murder who were under eighteen at the time of the offense "shall be punished by life imprisonment," and that they shall be eligible for parole after having served twenty-five years of incarceration. *Bear Cloud III*, ¶¶ 6-7, 334 P.3d at 136 (citing Wyo. Stat. Ann. §§ 6-2-101(b) and 6-10-301(c)); *see also Bird,* ¶ 9, 382 P.3d at 62 (finding we consider "the purpose of the challenged government action" when determining if two classes of people treated differently by the government are similarly situated) (citation omitted). The Legislature did not change the sentencing statutes for those eighteen and older. Put another way, in 2013 the Legislature expressly drew the line at eighteen, consistent with *Miller*. Wyoming statutes also generally establish age eighteen as the bright line between adults and juveniles, meaning § 6-2-101(b) is not an outlier. *See, e.g.,* Wyo. Stat. Ann. §§ 14-1-101(a) (establishing eighteen as the age of majority); 14-6-201(a)(ii)-(iii) (Juvenile Justice Act distinguishing between adult and child at age of majority); *see also MBP v. State*, 2022 WY 114, ¶ 22, 517 P.3d 542, 549 (Wyo. 2022) (stating "[j]uvenile delinquency proceedings are not criminal prosecutions but are special proceedings that serve as an ameliorative alternate to the criminal prosecution of children") (citations omitted). This Court cannot conclude juveniles and nineteen-year-olds are subject to the same circumstances and conditions.

[¶145] Mr. Hicks' equal protection challenge suffers from two fatal flaws. First, he did not identify a legislative classification in § 6-2-101(b) directed specifically at emerging adults. Second, he did not show § 6-2-101(b) treats similarly situated persons unequally. Because Mr. Hicks failed to carry the burden of identifying both elements to sustain a viable equal protection challenge, we conclude Mr. Hicks' mandatory life sentences without parole do not violate the equal protection provisions in the Wyoming Constitution. *See Krenning v. Heart Mountain Irrigation Dist.*, 2009 WY 11, ¶¶ 33-34, 200 P.3d 774, 784 (Wyo. 2009) (finding equal protection challengers did not meet their burden of clearly identifying the legislative classification at issue); *see also Reiter*, ¶¶ 26-27, 36 P.3d at 594-95 (finding equal protection challenger failed to demonstrate the groups were similarly situated).

## VI. Mr. Hicks is not entitled to a new sentencing hearing.

[¶146] Finally, Mr. Hicks maintains that even if we do not find generally that all late adolescents should receive a *Miller* hearing, the Court should find that one is required for him.

[¶147] In 2006, Mr. Hicks received individualized sentencing hearings for the convictions related to each victim, which considered mitigating factors. He now argues *Miller* entitles him to a new sentencing hearing because new science indicates his age should have been more thoroughly considered as a mitigating factor.

[¶148] We have already concluded that Mr. Hicks' sentences are consistent with *Miller* and do not violate the Wyoming Constitution. *See* Discussion of Constitutional Issues at II.B.; III.C.-D.; & IV. As such, this is not an instance where Mr. Hicks is entitled to a new sentencing hearing. *See Sen v. State*, 2013 WY 47, ¶¶ 49-51, 301 P.3d 106, 125-27 (Wyo. 2013) (finding the sentence was illegal and remanding for a new sentencing hearing); *see also Coy v. State*, 2014 WY 49, ¶ 21, 322 P.3d 821, 826 (Wyo. 2014) (stating this Court remands for a new sentencing hearing when "the sentence imposed is an illegal sentence").

[¶149] For these reasons, and although we commend Mr. Hicks for his personal growth and development while serving his sentence, we find the district court did not err when it denied Mr. Hicks' motion to correct his sentences.

## CONCLUSION

[¶150] The district court did not err when it denied Mr. Hicks' motion to correct illegal sentences. The Wyoming Constitution does not afford broader sentencing protections to emerging adults as a distinct category of criminal offenders. Our comparison of the Wyoming Constitution and the Eighth Amendment, however, has led us to the conclusion that the disjunctive cruel "or" unusual language in Article 1, Section 14 was intentional and requires a separate state constitutional test.

[¶151] Even so, Mr. Hicks failed to demonstrate his sentences violate Article 1, Section 14 or 15 of the Wyoming Constitution or the Eighth Amendment to the United States Constitution. Mr. Hicks also failed to demonstrate his sentences violate the equal protection provisions of the Wyoming Constitution or that he is entitled to a new sentencing hearing.

[¶152] Affirmed.